539 F.2d 107
 8 ERC 1993, 176 U.S.App.D.C. 105, 6
Envtl. L. Rep. 20,485
 AMERICAN FROZEN FOOD INSTITUTE, Petitioner,
v.
Russell E. TRAIN, Administrator, and Environmental
Protection Agency, Respondents (two cases).
POTATO PROCESSORS OF IDAHO, Petitioner,
v.
Russell E. TRAIN, Administrator, and Environmental
Protection Agency, Respondents.
 Nos. 74-1464, 74-1513 and 74-1840.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 28, 1975.
Decided May 11, 1976.
 
 Petition for Review of an Order of the Environmental Protection agency.
 Edward Brown Williams, Washington, D. C., with whom Jeffery Lee Greenspan, Washington, D. C., was on the brief for petitioners. Jan Edward Williams, Washington, D. C., also entered an appearance for petitioners.
 Edmund B. Clark, Atty., Dept. of Justice and Pamela P. Quinn, Atty., E.P.A., Washington, D. C., with whom Wallace H. Johnson, Asst. Atty. Gen., Robert V. Zener, Gen. Counsel, E.P.A., Martin Green and Joan M. Cloonan, Attys., Dept. of Justice, Washington, D. C., were on the brief for respondents. John E. Varnum, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondents.
 
 
 1
 Robert C. Barnard, Washington, D. C., filed a brief on behalf of Union Carbide Corp., Monsanto Company, Dow Chemical Co., E. I. duPont De Nemours and Co. and Celanese Corp. as amici curiae urging reversal. Charles F. Lettow, Washington, D. C., also entered an appearance for Union Carbide Corp. and others as amici curiae.
 
 
 2
 Edward L. Strohbehn, Jr., Washington, D. C., filed a brief on behalf of Natural Resources Defense Council, Inc., as amicus curiae urging affirmance.
 
 
 3
 Before BAZELON, Chief Judge, McGOWAN, Circuit Judge and EDWARDS,* Circuit Judge for the Sixth Circuit.
 
 
 4
 Opinion for the Court filed by Circuit Judge EDWARDS.
 
 
 5
 EDWARDS, Circuit Judge.
 
 
 6
 This case requires this court to review and interpret the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251, et seq. (Supp. III, 1973) (hereinafter referred to as the Act). This is a complicated and lengthy statute which, in mandatory terms, demands solution of one of America's most important problems, the increasing and nationally threatening pollution of our magnificent natural water resources, rivers, lakes and bounding oceans. In its Declaration of Goals and Policy, the Act imposes on American industry (and the American public through passed-on product costs) the economic burden of ending all discharges of pollutants by the year 1985. Section 101(a), 33 U.S.C. § 1251(a) (Supp. III, 1973). In some instances the statute clearly contemplates the closing of marginal plants which cannot function economically with the costs added by water pollution controls.
 
 
 7
 One expert on ecology has recently stated in cosmic terms the problem which engaged the urgent attention of the Congress for this nation:
 
 
 8
 WE, AS HUMAN BEINGS, are part of a complex array of living creatures that started to deploy on earth about three billion years ago and has never stopped diversifying. The only life system we know of and we are part of is based on carbon chemistry and cannot develop without water. . . .Some recent findings tend to establish that within the outer space of one galaxy, some organic chemical compounds are widely spread that could be considered as the building blocks of amino acids. This could be an indication of a sort of universal insemination, and that the stage is set in the cosmos for the potential development of life anywhere where circumstances are favorable; such favorable circumstances are based on the existence on a given planet of an abundance of water in the liquid state. Now, the liquid state itself of any element or of any compound is much rarer in the universe than solid state or gaseous state, and it is even much rarer in the case of water that remains liquid only in a very narrow range of temperature. The obvious consequence is that, even if life exists elsewhere, it is exceedingly sporadic, and very seldom finds on a celestial body the exceptional and lasting conditions that existed on Earth for three billion years and are likely to be enjoyed for another four or five billion years.
 
 
 9
 The recent access of our minds to these cosmic considerations endows human consciousness with a new dimension and invites our reason to give objectively even a higher prize to our lives than we used to do subjectively. The logical conclusion is that, of all priorities, the supreme imperative is to conserve, to protect, to nurse the water system of our planet; because its life is our own life, because its fate is our fate.
 
 
 10
 There are only two logical attitudes for the men of today: either to have a wonderful time . . . to consume and burn everything, and "Apres moi le deluge," or to take the four billion year challenge for mankind, that is, to try to keep our species alive as long as the Earth will offer acceptable conditions, and organize the world along non-kinesian principles, to pass it over in good shape to the next generation.
 
 
 11
 "A Time to Choose," address by Captain Jacques-Yves Cousteau to the Remote Sensing Symposium at University of Michigan, October 7, 1975.
 
 
 12
 Petitioners, who are representatives of the potato processing industry, attack on a broad front the Environmental Protection Administrator's actions under and his interpretation of the Federal Water Pollution Control Act Amendments of 1972 in applying the Act to the industry concerned. Certain other industry representatives have filed briefs amici curiae claiming that this court has no jurisdiction in this case.
 
 
 13
 The principal questions presented by this case are:
 
 
 14
 Does the United States Court of Appeals have jurisdiction to review the actions here complained of?
 
 
 15
 Did the Administrator violate the Act by combining in one document issued on one day his response to the requirements of Sections 301, 304 and 306 of the Act, thereby necessitating that his orders be set aside?
 
 
 16
 Did the Administrator violate the Act by promulgating national effluent limitations applicable to categories and subcategories of the industries concerned rather than by promulgating limitations for individual plants?
 
 
 17
 Other issues include petitioners' claims that the Administrator violated the Act by using Canadian plants as examples and that he abused his discretion by both procedural and substantive errors in the rule-making which resulted in the guidelines and the effluent limitations for the potato processing industry.
 
 
 18
 After detailed consideration of these specific questions, referred to above, we hold that this court has jurisdiction of this case. We also hold that the Administrator's interpretations of the Act are valid in the respects complained of. We find abuse of discretion in only one minor instance.
 
 
 19
 In Parts I and II of this opinion we set forth a general outline of the main features of the Act and its legislative history. This discussion provides a necessary basis for our more detailed interpretation of the Act in Part III. In Part IV we shall deal with the remaining issues, principally the claim of abuse of administrative discretion.
 
 I. THE STRUCTURE OF THE ACT
 
 20
 In Title I of the Act, we find the following sweeping Declaration of Goals and Policy:
 
 DECLARATION OF GOALS AND POLICY
 
 21
 Sec. 101. (a) The objective of this Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this Act
 
 
 22
 (1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;
 
 
 23
 (2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;
 
 
 24
 (3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;
 
 
 25
 (4) it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;
 
 
 26
 (5) it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State; and
 
 
 27
 (6) it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans.
 
 
 28
 33 U.S.C. § 1251(a) (Supp. III, 1973) (Emphasis added.)
 
 
 29
 Concern about pollution of the nation's lakes, rivers, harbors and contiguous oceans is by no means new:
 
 
 30
 The Federal Water Pollution Control Act . . . was originally enacted by act June 30, 1948, c. 758, 62 Stat. 1155, and amended by Acts July 17, 1952, c. 927, 66 Stat. 755; July 9, 1956, ch. 518, 70 Stat. 498; June 25, 1959, Pub.L. 86-70, 73 Stat. 141; July 12, 1960, Pub.L. 86-624, 74 Stat. 411; July 20, 1961, Pub.L. 87-88, 75 Stat. 204; Oct. 2, 1965, Pub.L. 89-234, 79 Stat. 903; Nov. 3, 1966, Pub.L. 89-753, 80 Stat. 1246; Apr. 3, 1970, Pub.L. 91-224, 84 Stat. 91; Dec. 31, 1970, Pub.L. 91-611, 84 Stat. 1818; July 9, 1971, Pub.L. 92-50, 85 Stat. 124; Oct. 13, 1971, Pub.L. 92-137, 85 Stat. 379; Mar. 1, 1972, Pub.L. 92-240, 86 Stat. 47.
 
 
 31
 However, the Federal Water Pollution Control Act Amendments of 1972 are not mere amendments to previous control attempts. Preceding pollution control measures were fundamentally designed to determine what lakes and streams had become polluted beyond toleration and then to locate the particular polluters and suppress the discharges that were causing the condition. Determination of which polluter caused what pollution proved over the years to be an impractical task. Congress was confronted by failure of efforts which its leaders estimated to have cost $20 billion of public funds. It also was confronted by continuing and increasing massive pollution which was turning many American rivers into open sewers, was threatening the extinction of marine life in several of the Great Lakes, as well as our ocean harbors, and was endangering the purity of our waters for drinking, for water recreation, for crop irrigation, and for industrial usage.
 
 
 32
 By 1972 Congress determined upon a wholly new approach. The basic concept of the Act we construe in this case is an ultimate flat prohibition upon all discharges of pollutants:
 
 
 33
 Sec. 301. (a) Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful.
 
 
 34
 Sec. 301(a), 33 U.S.C. § 1311(a) (Supp. III, 1973).
 
 
 35
 The fantastic disruption of economic life which would be occasioned by immediate implementation of this enactment is alleviated by a complex set of statutory exceptions provided for under federal and state permit programs all designed to require decreasing levels of pollutant discharges and aimed at achieving by 1985 the ultimate national goal of eliminating the discharge of all pollutants in any American lakes, rivers, or contiguous seas.
 
 
 36
 In the interim period the act provides for national standards called "effluent limitations" applicable to statutorily named categories and classes of industrial and commercial dischargers. The first purpose of the effluent limitations is to achieve by July 1, 1977 "the best practicable control technology currently available." (§ 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A) ). The effluent limitations are to be based on "effluent limitations guidelines" published after carefully devised study procedures (§ 304, 33 U.S.C. § 1314).
 
 
 37
 The Act further requires by July 1, 1983, "effluent limitations for categories and classes of point sources . . . that shall require application of "the best available technology economically achievable for each category or class." (§ 301(b)(2)(A), 33 U.S.C. § 1311(b)(2)(A) ).
 
 
 38
 Where application of "the best available technology" does not result in the complete elimination of discharges of pollutants, the Act calls for continuing periodic review, presumably until all discharges are terminated. (§ 301(d), 33 U.S.C. § 1311(d) ).
 
 
 39
 This same standard, i. e. "best available technology," is mandated forthwith for all new plant construction (new point sources) by § 306, 33 U.S.C. § 1316. This section also allows a 10-year period of amortization of costs before any higher standard may be imposed.
 
 
 40
 The Act sets forth machinery for state enforcement of these nationally set standards through state permit programs where the Administrator determines that the state concerned "has the capability of administering a permit program which will carry out the objective of this Act. . . ." (§ 402(a)(5), 33 U.S.C. § 1342(a)(5) ). As to nonparticipating states, direct enforcement through a federal permit program is retained in the hands of the federal Administrator. (§ 402(a)(1), (2), (3), 33 U.S.C. § 1342(a)(1), (2), (3) ). In addition, as to participating states the Act clearly gives the federal Administrator ultimate enforcement power and responsibility if a state fails in its permit issuing or enforcement responsibilities under the Act. (§ 402(c), 33 U.S.C. § 1342(c) ).
 
 
 41
 Enforcement of the permit program described above is provided for by both civil and criminal proceedings in the United States District Court as set forth in § 309, 33 U.S.C. § 1319, of the Act. In addition, under § 505, 33 U.S.C. § 1365, private suits by adversely affected citizens to enforce the provisions of the Act can be brought in the United States District Courts.
 
 
 42
 The Administrator is given statutory authority to "prescribe such regulations as are necessary to carry out his functions" under the Act. (§ 501(a), 33 U.S.C. § 1361).
 
 
 43
 Judicial review of the actions of the federal Administrator is provided for by original action in the various United States Courts of Appeals. (§ 509, 33 U.S.C. § 1369).
 
 
 44
 What has been set forth above represents only the skeletal structure of the Act as it applies to industrial and commercial pollutant discharges.[1]
 
 II. LEGISLATIVE HISTORY
 
 45
 The legislative history of this Act is readily available. It is fully compiled in two volumes entitled "A Legislative History of the Water Pollution Control Act Amendments of 1972."[2] From this work we select principally those statements which deal specifically with effluent limitations, as set forth in § 301 and § 306, their relationship to the information and guideline program of § 304, the permit program outlined in § 402, the enforcement program outlined in § 309, and judicial review as called for in § 509.
 
 
 46
 The Joint Conference Report deals directly with one of the major issues in this appeal by squarely rejecting plant-by-plant determination of effluent limitations:
 
 
 47
 The conferees intend that the Administrator or the State, as the case may be, will make the determination of the economic impact of an effluent limitation on the basis of classes and categories of point sources, as distinguished from a plant by plant determination. However, after July 1, 1977, the owner or operator of a plant may seek relief from the requirement to achieve effluent limitations based on best available technology economically achievable. The burden will be on him to show that modified requirements will represent the maximum use of technology within his economic capability and will result in reasonable further progress toward the elimination of the discharge of pollutants. If he makes this showing, the Administrator may modify the requirements applicable to him. Leg.Hist. at 304.
 
 
 48
 The central importance of § 301 to the total Congressional plan is enunciated in the Committee Report which follows. In addition, this Senate Report on the Bill indicates clearly that the best practicable level of enforcement by 1977 is to be set at least as high as an average of the best performers in the category or class of industry concerned while the best available level of performance required by 1983 is to be set, "at a minimum," in relation to the best performer in any such industrial category:
 
 
 49
 It is the Committee's intention that pursuant to subsection 301(b)(1)(A), and Section 304(b) the Administrator will interpret the term "best practicable" when applied to various categories of industries as a basis for specifying clear and precise effluent limitations to be implemented by January 1, 1976. In defining best practicable for any given industrial category, the Committee expects the Administrator to take a number of factors into account. These factors should include the age of the plants, their size and the unit processes involved and the cost of applying such controls. In effect, for any industrial category, the Committee expects the Administrator to define a range of discharge levels, above a certain base level applicable to all plants within that category. In applying effluent limitations to any individual plant, the factors cited above should be applied to that specific plant. In no case, however, should any plant be allowed to discharge more pollutants per unit of production than is defined by that base level.
 
 
 50
 The Administrator should establish the range of best practicable levels based upon the average of the best existing performance by plants of various sizes, ages, and unit processes within each industrial category. It is acknowledged that in those industrial categories where present practices are uniformly inadequate, the Administrator may determine best practicable to require higher levels of control than any currently in place if he determines the technology to achieve those higher levels can be practicably applied.
 
 
 51
 Best practicable can be assumed to substitute for the present terminology "equivalent of secondary treatment for industry(") but this interpretation should not be construed as limiting the authority of the Administrator.
 
 
 52
 Under the Phase II the Committee intends that effluent limitations be based upon application of best available technology as defined by the Administrator. In making the determination of "best available" the Committee expects the Administrator to apply the same principles involved in making the determination of best practicable as outlined above except that rather than the range of levels established in reference to the average of the best performers in an industrial category the range should at a minimum be referenced to the best performer in any industrial category.
 
 
 53
 The distinction between best practicable and best available is intended to reflect the Committee's intent press toward increasingly higher levels of control, applied over five year periods. Through research and development of new processes, modifications, replacement of obsolete plants and processes, and other improvements in technology, the Committee anticipates that it should be possible, taking into account the cost of controls, to achieve, by 1981 levels of control approaching 95-99 percent reduction of pollutants discharged in most cases and complete recycling in the remainder.
 
 Leg.Hist. at 1468-69. (Emphasis added.)
 
 54
 The critical importance of "nationally uniform effluent limitations" is emphasized by these comments from Senator Muskie:
 
 
 55
 Senators will recall from the November debate on the Senate bill that there were three essential elements to it: Uniformity, finality, and enforceability. Without these elements a new law would not constitute any improvement on the old; we would not bring a conference agreement to the floor without them.
 
 
 56
 As far as uniformity and finality are concerned, the conference agreement provides that each polluter within a category or class of industrial sources will be required to achieve nationally uniform effluent limitations based on "best practicable" technology no later than July 1, 1977. This does not mean that the Administrator cannot require compliance by an earlier date; it means that these limitations must be achieved no later than July 1, 1977, that they must be uniform, and that they will be final upon the issuance of a permit under section 402 of the bill.
 
 
 57
 The third critical element that concerned the Senate in its consideration of this legislation was enforceability. Enforceability is assured through the provisions of the permit program and through section 309, the enforcement section of the act. The Administrator has the responsibility to determine the effluent limitations to be applied to each category or class of polluter, to set forth those limitations in a permit issued pursuant to section 402 of the act, and to enforce those limitations through the provisions of section 309.
 
 Leg.Hist. at 162-63. (Emphasis added.)
 
 58
 The same Senator also introduced the following exhibit concerning the relationship between §§ 301 and 304 and how "the best practicable technology" to be required by 1977 will be determined:
 
 
 59
 The Conference agreement establishes a two phase program for the application and enforcement of effluent limitations. The first phase requires point sources to achieve that level of effluent reduction identified as "best practicable control technology" no later than July 1, 1977. The Conferees attempted to clarify what was intended by the term "best practicable control technology".
 
 
 60
 It is the intention that pursuant to subsection 301(b)(1)(A) and Section 304(b), the Administrator will interpret the term "best practicable" when applied to various categories of industries as a basis for specifying clear and precise effluent limitations to be implemented by July 1, 1977. In defining "best practicable" for any given industrial category, the Committee expects the Administrator to take a number of factors into account. These factors should include the age of the plants, their size, the unit processes involved, and the cost of applying such controls.
 
 
 61
 The Administrator should establish the range of "best practicable" levels based upon the average of the best existing performance by plants of various sizes, ages, and unit processes within each industrial category. In those industrial categories where present practices are uniformly inadequate, the Administrator should interpret "best practicable" to require higher levels of control than any currently in place if he determines that the technology to achieve those higher levels can be practicably applied.
 
 
 62
 "Best practicable" can be interpreted as the equivalent of secondary treatment for industry, but this interpretation should not be construed to limit the authority of the Administrator.
 
 
 63
 The modification of subsection 304(b)(1) is intended to clarify what is meant by the term "practicable". The balancing test between total cost and effluent reduction benefits is intended to limit the application of technology only where the additional degree of effluent reduction is wholly out of proportion to the costs of achieving such marginal level of reduction for any class or category of sources.
 
 
 64
 The Conferees agreed upon this limited cost-benefit analysis in order to maintain uniformity within a class and category of point sources subject to effluent limitations, and to avoid imposing on the Administrator any requirement to consider the location of sources within a category or to ascertain water quality impact of effluent controls, or to determine the economic impact of controls on any individual plant in a single community.
 
 
 65
 It is assumed, in any event, that "best practicable technology" will be the minimal level of control imposed on all sources within a category or class during the period subsequent to enactment and prior to July 1, 1977.
 
 
 66
 The Conference agreement requires that implementation plans and compliance schedules in existing water quality standards be adhered to, to the extent that those plans and schedules require compliance no later than July 1, 1977, and to the extent that they call for a degree of pollution control no less stringent than that defined by "best practicable control technology".
 
 Leg.Hist. at 169-70. (Emphasis added.)
 
 67
 This same document states the Congressional purpose of employment of "the best available technology" by 1983 "without regard to cost":
 
 
 68
 The Conference agreement applies a different test to the Administrator's determination of "best available demonstrated technology". In determining the degree of effluent reduction to be achieved for a category or class of sources by 1983, the Administrator may consider a broader range of technological alternatives and should, at a minimum, review capabilities which exist in operation or which can be applied as a result of public and private research efforts.
 
 
 69
 In making the determination of "best available" for a category or class, the Administrator is expected to apply the same principles involved in making the determination of "best practicable" (outlined above), except as to cost-benefit analysis. Also, rather than establishing the range of levels in reference to the average of the best performers in an industrial category, the range should, at a minimum, be established with reference to the best performer in any industrial category.
 
 
 70
 The distinction between "best practicable" and "best available" is intended to reflect the need to press toward increasingly higher levels of control in six-year stages. Through the research and development of new processes, modifications, replacement of obsolete plans and processes, and other improvements in technology, it is anticipated that it should be possible, taking into account the cost of controls, to achieve by 1983 levels of control which approach and achieve the elimination of the discharge of pollutants.
 
 
 71
 As to the cost of "best available" technology, the Conferees agreed upon the language of the Senate bill in Section 304(b)(2). While cost should be a factor in the Administrator's judgment, no balancing test will be required. The Administrator will be bound by a test of reasonableness. In this case, the reasonableness of what is "economically achievable" should reflect an evaluation of what needs to be done to move toward the elimination of the discharge of pollutants and what is achievable through the application of available technology without regard to cost.
 
 Leg.Hist. at 170. (Emphasis added.)
 
 72
 The harshness of the preceding paragraph is subject to relief under § 301(c) which gives the Administrator the power to modify the effluent limitation as to any particular point source which is 1) employing the best available technology within its economic capability, and 2) making reasonable further progress toward elimination of discharge of pollutants. This is made clear in the following paragraph from Senator Muskie's exhibit:
 
 
 73
 The Conferees have provided, however, a mechanism for individual point-source-by-source consideration in section 301(c). That section provides that the Administrator may modify any effluent limitation based on "best available technology" to be achieved by July 1, 1983, with respect to any point source, upon a showing by the owner or operator of such point source that an effluent limitation so modified will represent the maximum use of technology within the economic capability of the operator and will result in reasonable further progress toward the goal of the elimination of the discharge of pollutants.
 
 
 74
 Leg.Hist. at 172.
 
 
 75
 Senator Muskie also detailed the relationship contemplated between the guideline section, § 304, and the effluent limitation section, § 301:
 
 
 76
 Section 304(b), as agreed to by the Conferees, requires that the Administrator publish regulations which shall provide guidelines for the establishment of the effluent limitations to be achieved by categories and classes of point sources (other than publicly owned treatment works) pursuant to section 301(b) of the Act.
 
 
 77
 Section 304(b) identifies certain factors to be taken into account by the Administrator in determining the "best practicable" treatment and the "best available" treatment applicable to categories or classes of point sources. Among those factors are considerations of costs. In determining the "best practicable technology" for a particular class or category of point sources, the Administrator is directed to consider the relationship between the total cost of the application of such technology and the effluent reduction benefits to be achieved from such application within that category or class.
 
 
 78
 In determining the "best available technology" for a particular category or class of point sources, the Administrator is directed to consider the cost of achieving effluent reduction. The Conferees intend that the factors described in section 304(b) be considered only within classes or categories of point sources and that such factors not be considered at the time of the application of an effluent limitation to an individual point source within such a category or class.
 
 
 79
 Except as provided for in section 301(c) of the Act, the intent is that effluent limitations applicable to individual point sources within a given category or class be as uniform as possible. The Administrator is expected to be precise in his guidelines so as to assure that similar point sources with similar characteristics, regardless of their location or the nature of the water into which the discharge is made, will meet similar effluent limitations.
 
 Leg.Hist. at 171-72. (Emphasis added.)
 
 80
 The Senate Report makes clear that § 304(b) requires guidelines for setting effluent limitations under § 301 "which will be imposed as conditions of permits issued under § 402":
 
 
 81
 Subsection (b) of this section requires the Administrator, within one year after enactment, to publish guidelines for setting effluent limitations reflecting the mandate of section 301, which will be imposed as conditions of permits issued under section 402. These guidelines would identify what constituted the "best practicable control technology currently available" and the "best available control measures and practices," and the degree of effluent reduction attainable through the application of each. Thus, these guidelines would define the effluent limitations required by the first and second phases of the program established under section 301. In addition, the Administrator would identify control measures and practicesavailable to eliminate the discharge of pollutants from any category of point sources, to allow the full implementation of the objectives of the Act.
 
 
 82
 Leg.Hist. at 1469.
 
 
 83
 In the House, phased compliance with nationally uniform standards and the critical dates of 1977 and 1983 were emphasized. Rep. Jones of Alabama said:
 
 
 84
 Title III of the conference report contains many of the basic provisions for standards and enforcement. Included are section 301(b)(1)(A), which requires point sources to achieve by July 1, 1977, effluent limitations which require the application of "best practicable control technology currently available" and section 301(b)(2)(A) which requires point sources to achieve by July 1, 1983, effluent limitations which require the application of "best available technology economically achievable."
 
 
 85
 It is the intention of the managers that the July 1, 1977, requirements be met by phased compliance and that all point sources will be in full compliance no later than July 1, 1977. Discharge permits issued by the Administrator or by the States should include any applicable implementation plans established under existing water quality standards.
 
 
 86
 If the owner or operator of a given point source determines that he would rather go out of business than meet the 1977 requirements, the managers clearly expect that any discharge issued in the interim would reflect the fact that all discharges not in compliance with such "best practicable control technology currently available" would cease by June 30, 1977. In any event, the discharge would have to be consistent with any applicable water quality standards including implementation plans.
 
 
 87
 By the term "best practicable" the managers mean that all factors set forth in section 304(b)(1)(B) are to be taken into consideration. With the exception of modifications of section 301 requirements for the discharges of heat which may be made pursuant to section 316(a), the determination of the "best practicable control technology currently available" is not to be based upon the existing quality of the receiving waters. The managers expect that the total cost of application of technology in relation to the effluent limitation benefits to be achieved will always be a factor used by the Administrator in his determination of "best practicable control technology currently available" for a given category or class of point source.
 
 
 88
 The term "total cost of application of technology" as used in section 304(b)(1)(B) is meant to include those internal, or plant, costs sustained by the owner or operator and those external costs such as potential unemployment, dislocation, and rural area economic development sustained by the community, area, or region.
 
 
 89
 By the term "control technology" the managers mean the treatment facilities at the end of a manufacturing, agricultural, or other process, rather than control technology within the manufacturing process itself.
 
 
 90
 By the term "currently available" the managers mean the control technology, which, by demonstration projects, pilot plans, or general use, has demonstrated a reasonable level of engineering and economic confidence in the viability of the process at the time of commencement of actual construction of the control facilities.
 
 
 91
 The House managers were determined and successful in their efforts to make sure that the factors in sections 304(b)(1)(B) and 304(b)(2)(B) relating to the assessment of "best practicable control technology currently available" and "best available technology economically achievable," respectively, included consideration of nonwater quality environmental impact, including energy requirements. The managers believe that it would be foolhardy to credit one environmental account and debit another by the same action. Their intent is that the assessment of "best practicable control technology currently available" shall be such that the net effect on water and other environmental needs will be positive and beneficial, and that other impacts of water quality environmental efforts would not negate the overall benefit of the achievement of higher water quality.
 
 Leg.Hist. at 231-32. (Emphasis added.)
 
 92
 Representative Dingell specifically noted that effluent limitations should not be set on a plant-by-plant basis:
 
 
 93
 Eighth, the bill, in section 301, establishes a two-phase program for application and enforcement of effluent limitations. The first phase requires achievement by July 1, 1977, of that level of effluent reduction identified as "best practicable control technology." It should be emphasized that the term "best practicable" does not mean a reliance on secondary treatment. The second phase provides a higher degree of effluent reduction to be achieved by 1983. The distinction between "best practicable" and "best available" is intended to reflect the need to press toward increasingly higher levels of control.
 
 
 94
 The conference report emphasizes on page 121 a very important point. The report states:
 
 
 95
 The conferees intend that the Administrator or the State, as the case may be, will make the determination of the economic impact of an effluent limitation on the basis of classes and categories of point sources, as distinguished from a plant-by-plant determination.
 
 
 96
 Thus, a plant-by-plant determination of the economic impact of an effluent limitation is neither expected, nor desired, and, in fact, it should be avoided.
 
 The report also states on page 171:
 
 97
 * * * after July 1, 1977, the owner or operator of a plant may seek relief from the requirement to achieve effluent limitations based on best available technology economically achievable. The burden will be on him to show that modified requirements will represent the maximum use of technology within his economic capability and will result in reasonable further progress toward the elimination of the discharge of pollutants. If he makes this showing, the Administrator may modify the requirements applicable to him.
 
 
 98
 This provision could be troublesome, if EPA does not administer it properly. This is, of course, an area where the public participation requirement of section 101(e) of the bill will be most important. In order to avoid any possibility of a weakening of the after-1977 requirement, EPA must establish procedures for the public to participate in modified effluent limitations such as may result from such "relief" requests. The applicant's showing must be available to the public for comment, as well as EPA's proposed determination.
 
 
 99
 In making this determination, EPA should assure itself that, even if such "relief" is granted, it will still result in "further progress toward elimination of the discharge of pollutants" from point sources than has resulted from the pre-1977 requirements.
 
 Leg.Hist. at 254-55. (Emphasis added.)
 
 100
 Representative Wright stated that the effluent limitations called for in § 301 were to be promulgated as "regulations":
 
 
 101
 Subsection 104(t) provides that the Administrator shall conduct continuing comprehensive studies of the effects and methods of control of thermal discharges. The results of these studies shall be reported by the Administrator no later than 270 days after enactment, and shall be considered by the Administrator in proposing regulations with respect to thermal discharges under section 316 and by the States in proposing thermal water quality standards. These studies will provide needed data and should be very helpful to the Administrator in proposing regulations. The Administrator should consider the results of these studies in promulgating regulations not only under section 316 but also under other sections of the act where thermal discharges may be regulated, including section 301 on effluent limitations, section 303 on water quality standards, and section 306 on new source performance standards.
 
 Leg.Hist. at 264. (Emphasis added.)
 
 102
 The discussion of the section on judicial review of the actions of the Administrator by the United States Courts of Appeals (§ 509) emphasizes 1) that review is to be expedited and 2) that it should not impede enforcement. See Leg.Hist. at 330-31, 822-23, 1502-03.
 
 
 103
 In pursuance of these goals the statute itself provides for expedited review by the Courts of Appeals and prohibits any later review of actions of the Administrator, subject to § 509 review, in enforcement proceedings. See § 509(b)(2), 33 U.S.C. § 1369(b)(2) (Supp. III, 1973).
 
 
 104
 Finally, the Committee Report from the House makes clear that "guidelines" under § 304 are not in themselves enforcible until "promulgated" under other sections of the Bill particularly §§ 301 and 306. It also makes clear that if a point source has a valid permit under § 402, compliance with that permit and its terms is compliance with §§ 301 and 306 for purposes of the enforcement program provided for in §§ 309 and 505:
 
 
 105
 The Committee points out, as it did in the discussion of section 401, that the term "applicable" used in section 402 has two meanings. It means that the requirement which the term "applicable" refers to must be pertinent and apply to the activity and the requirement must be in existence by having been promulgated or implemented.
 
 
 106
 The Committee further recognizes that the requirements under sections 301, 302, 306, 307, 308, 316 and 403 will not all be promulgated immediately upon enactment of this bill. Nevertheless, it would be unreasonable to delay issuing of permits until all the implementing steps are necessary. Therefore, subsection (a)(2) provides that prior to the taking of the necessary implementing actions relating to all such requirements, the Administrator may issue permits during this interim period with such conditions as he determines are necessary to carry out the provisions of this Act. Thus, the new permit program may be initiated without undue delay upon enactment of this Act.
 
 
 107
 Subsection (a)(2) requires the Administrator to prescribe conditions for these permits to assure compliance with the requirements of subsection (a)(1), including conditions on data and information collection, reporting and such other requirements as he deems appropriate.
 
 
 108
 Subsection (a)(3) provides that the Administrator's permit program and the permits he issues will be subject to the same terms, conditions, requirements as apply to a state permit program and permit issued under subsection (b).
 
 Leg.Hist. at 812-13. (Emphasis added.)
 
 109
 Subsection (1) provides that compliance with a permit issued pursuant to section 402 shall be considered to be compliance for purposes of sections 309 and 505, with section 301, 302, 306, 307, 316 and 403, except any standard imposed upon section 307 for a toxic pollutant injurious to public health. The purpose of this provision is to assure that the mere promulgation of any effluent limitation or other limitation, a standard, or a thermal discharge regulation, by itself will not subject a person holding a valid permit to prosecution. However, once such a requirement is actually made a condition of the permit, then the permittee will be held to comply with the terms thereof.
 
 Leg.Hist. at 815. (Emphasis added.)
 
 110
 This review of the language and structure of the Act and its legislative history leads us to four final conclusions and two tentative conclusions.Final Conclusions
 
 
 111
 The Act, although entitled "Amendments," is an entirely new approach to water pollution control.
 
 
 112
 The principal purpose of the Act is to achieve the complete elimination of all discharges of pollutants into the nation's waters by 1985 or as soon thereafter as may be.
 
 
 113
 The authors of the Act clearly foresaw that its impact would be very costly to both the public and private sectors and determined to proceed in spite of the cost.
 
 
 114
 The authors of the Act were much concerned about timely implementation, and specified implementation dates of 1977, 1983 and 1985 for different phases of achievement of the principal purpose of elimination of all pollutants.
 
 Tentative Conclusions
 
 115
 Section 301 of the Act is the fundamental control section and contemplates national standards of effluent limitations (rather than individual plant standards).
 
 
 116
 Review of all standards (including § 301 effluent limitations) promulgated by the Administrator is provided for in the various United States Courts of Appeals by § 509 of the Act.
 
 
 117
 Further analysis of the tentative conclusions will follow in answers to the issues presented in this case.
 
 III. THE STATUTORY ISSUES
 
 118
 1. Jurisdiction (and EPA's § 301 authority). The Act[3] gives the Courts of Appeals of the United States wide and exclusive jurisdiction to review the actions of the Administrator:
 
 
 119
 (b)(1) Review of the Administrator's action (A) in promulgating any standard of performance under section 306, (B) in making any determination pursuant to section 306(b)(1)(C), (C) in promulgating any effluent standard, prohibition, or treatment standard under section 307, (D) in making any determination as to a State permit program submitted under section 402(b), (E) in approving or promulgating any effluent limitation or other limitation under section 301, 302, or 306, and (F) in issuing or denying any permit under section 402, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.
 
 
 120
 (2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) of this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement.
 
 
 121
 § 509(b), 33 U.S.C. § 1369(b) (Supp. III, 1973). (Emphasis added.)
 
 
 122
 On the other hand the role of the United States District Courts under the applicable portions of this Act is directed to enforcement proceedings against alleged polluters:
 
 FEDERAL ENFORCEMENT
 
 123
 Sec. 309. (a)(1) Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any condition or limitation which implements section 301, 302, 306, 307 or 308 of this Act in a permit issued by a State under an approved permit program under section 402 of this Act, he shall proceed under his authority in paragraph (3) of this subsection or he shall notify the person in alleged violation and such State of such finding. If beyond the thirtieth day after the Administrator's notification the State has not commenced appropriate enforcement action, the Administrator shall issue an order requiring such person to comply with such condition or limitation or shall bring a civil action in accordance with subsection (b) of this section.
 
 
 124
 (2) Whenever, on the basis of information available to him, the Administrator finds that violations of permit conditions or limitations as set forth in paragraph (1) of this subsection are so widespread that such violations appear to result from a failure of the State to enforce such permit conditions or limitations effectively, he shall so notify the State. If the Administrator finds such failure extends beyond the thirtieth day after such notice, he shall give public notice of such finding. During the period beginning with such public notice and ending when such State satisfies the Administrator that it will enforce such conditions and limitations (hereafter referred to in this section as the period of 'federally assumed enforcement'), the Administrator shall enforce any permit condition or limitation with respect to any person
 
 
 125
 (A) by issuing an order to comply with such condition or limitation, or
 
 
 126
 (B) by bringing a civil action under subsection (b) of this section.
 
 
 127
 (3) Whenever on the basis of any information available to him the Administrator finds that any person is in violation of section 301, 302, 306, 307, or 308 of this Act, or is in violation of any permit condition or limitation implementing any of such sections in a permit issued under section 402 of this Act by him or by a State, he shall issue an order requiring such person to comply with such section or requirement, or he shall bring a civil action in accordance with subsection (b) of this section.
 
 
 128
 (4) A copy of any order issued under this subsection shall be sent immediately by the Administrator to the State in which the violation occurs and other affected States. Any order issued under this subsection shall be by personal service and shall state with reasonable specificity the nature of the violation, specify a time for compliance, not to exceed thirty days, which the Administrator determines is reasonable, taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements. In any case in which an order under this subsection (or notice to a violator under paragraph (1) of this subsection) is issued to a corporation, a copy of such order (or notice) shall be served on any appropriate corporate officers. An order issued under this subsection relating to a violation of section 308 of this Act shall not take effect until the person to whom it is issued has had an opportunity to confer with the Administrator concerning the alleged violation.
 
 
 129
 (b) The Administrator is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a) of this section. Any action under this subsection may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such action shall be given immediately to the appropriate State.
 
 
 130
 (c)(1) Any person who willfully or negligently violates section 301, 302, 306, 307, or 308 of this Act or any permit condition or limitation implementing any of such sections in a permit issued under section 402 of this Act by the Administrator or by a State shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment for not more than one year, or by both. If the conviction is for a violation committed after a first conviction of such person under this paragraph, punishment shall be by a fine of not more than $50,000 per day of violation, or by imprisonment for not more than two years, or by both.(2) Any person who knowingly makes any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under this Act or who falsifies, tampers with, or knowingly renders inaccurate any monitoring device or method required to be maintained under this Act, shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than six months or by both.
 
 
 131
 (3) For the purposes of this subsection, the term 'person' shall mean, in addition to the definition contained in section 502(5) of this Act, any responsible corporate officer.
 
 
 132
 (d) Any person who violates section 301, 302, 306, 307, or 308 of this Act, or any permit condition or limitation implementing any of such sections in a permit issued under section 402 of this Act by the Administrator, or by a State, and any person who violates any order issued by the Administrator under subsection (a) of this section, shall be subject to a civil penalty not to exceed $10,000 per day of such violation.
 
 
 133
 (e) Whenever a municipality is a party to a civil action brought by the United States under this section, the State in which such municipality is located shall be joined as a party. Such State shall be liable for payment of any judgment, or any expenses incurred as a result of complying with any judgment, entered against the municipality in such action to the extent that the laws of that State prevent the municipality from raising revenues needed to comply with such judgment.
 
 
 134
 § 309, 33 U.S.C. § 1319 (Supp. III, 1973).
 
 
 135
 It is important to note that this section makes § 301 limitations enforceable by both criminal and civil penalties. Congress, however, did not make the "guidelines" of § 304 enforceable against polluters under this (or any other) section except as they are promulgated as limitations or standards under §§ 301, 302, 306 or 307, or as they may be incorporated as conditions or limitations under permits issued under § 402.
 
 
 136
 Private suits in the United States District Courts based upon alleged violations of § 301 effluent limitations are also provided for as an additional means of enforcement:
 
 
 137
 Sec. 505. (a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf
 
 
 138
 (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or
 
 
 139
 (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator.
 
 
 140
 The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 309(d) of this Act.
 
 
 141
 § 505(a), 33 U.S.C. § 1365(a) (Supp. III, 1973).
 
 
 142
 The specific language of § 509(b) grants this court authority to review the "effluent limitations" issued by the Administrator under § 301, § 302 and § 306. The petitioners and the respondent in this case agree that this court has such jurisdiction. Amici from the chemical and oil industries, however, present a different point of view. They contend that the statute gives the Administrator no authority to issue nationwide effluent limitations under § 301. They argue that the guidelines called for in § 304 are the controlling regulations. Therefore, since § 509 contains no specific authority for the Courts of Appeals to review the "guidelines" issued by the Administrator under § 304, this court is without authority to review the issues in this case. They also contend that § 304 "guidelines" applicable to the industries concerned can only be reviewed in the United States District Courts.
 
 
 143
 In this regard they cite and rely upon CPC International Inc. v. Train, 515 F.2d 1032 (8th Cir. 1975). We disagree with amici in this case. Respectfully, we also disagree with the Eighth Circuit in CPC International, supra.
 
 
 144
 From the express language of the Act and its legislative history, we have no doubt that the Act provides for issuance of "guidelines" under § 304(b) for categories of pollution point sources and that these " guidelines" were intended by Congress as a source of guidance to the Administrator in issuance of "effluent limitations" under § 301 for categories and classes of pollution point sources. Further, the "guidelines" and " effluent limitations" were intended to serve as controlling standards for state permit programs under § 402.
 
 
 145
 It is important to remember in direct contrast to the arguments of amici in this case and the interpretation of the Act set forth in the Eighth Circuit's opinion in CPC International that § 301 is the basic enforcement mechanism relied upon by Congress:
 
 
 146
 Sec. 301. (a) Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful.
 
 
 147
 (b) In order to carry out the objective of this Act there shall be achieved
 
 
 148
 (1)(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 304(b) of this Act, or (ii) in the case of a discharge into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, which shall require compliance with any applicable pretreatment requirements and any requirements under section 307 of this Act; and
 
 
 149
 (B) for publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 203 of this Act prior to June 30, 1974 (for which construction must be completed within four years of approval), effluent limitations based upon secondary treatment as defined by the Administrator pursuant to section 304(d)(1) of this Act; or,
 
 
 150
 (C) not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 510) or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this Act.
 
 
 151
 (2)(A) not later than July 1, 1983, effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which (i) shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator pursuant to section 304(b)(2) of this Act, which such effluent limitations shall require the elimination of discharges of all pollutants if the Administrator finds, on the basis of information available to him (including information developed pursuant to section 315), that such elimination is technologically and economically achievable for a category or class of point sources as determined in accordance with regulations issued by the Administrator pursuant to section 304(b)(2) of this Act, or (ii) in the case of the introduction of a pollutant into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, shall require compliance with any applicable pretreatment requirements and any other requirement under section 307 of this Act; and
 
 
 152
 (B) not later than July 1, 1983, compliance by all publicly owned treatment works with the requirements set forth in section 201(g)(2)(A) of this Act.
 
 
 153
 (c) The Administrator may modify the requirements of subsection (b)(2)(A) of this section with respect to any point source for which a permit application is filed after July 1, 1977, upon a showing by the owner or operator of such point source satisfactory to the Administrator that such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants.
 
 
 154
 (d) Any effluent limitation required by paragraph (2) of subsection (b) of this section shall be reviewed at least every five years and, if appropriate, revised pursuant to the procedure established under such paragraph.
 
 
 155
 (e) Effluent limitations established pursuant to this section or section 302 of this Act shall be applied to all point sources of discharge of pollutants in accordance with the provisions of this Act.
 
 
 156
 (f) Notwithstanding any other provisions of this Act it shall be unlawful to discharge any radiological, chemical, or biological warfare agent or high-level radioactive waste into the navigable waters.
 
 
 157
 33 U.S.C. § 1311 (Supp. III, 1973).
 
 
 158
 The very first sentence in § 301(a) provides the fundamental prohibition: "Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful." Significantly, this fundamental sentence makes no reference at all to § 304(b). Further, as noted above, there is no provision in the Act for enforcement of the § 304(b) guidelines against polluters. But § 301(e) specifically provides:
 
 
 159
 (e) Effluent limitations established pursuant to this section or section 302 of this Act shall be applied to all point sources of discharge of pollutants in accordance with the provisions of this Act.
 
 
 160
 33 U.S.C. § 1311(e) (Supp. III, 1973).
 
 
 161
 We note, of course, the argument of amici curiae and the Eighth Circuit that § 301 does not expressly direct the Administrator to promulgate the "effluent limitations" which § 301 says "should be achieved." This argument, based on the employment of the passive tense in relation to effluent limitations, ignores the fact that § 301 begins with the fundamental statutory prohibition that (with named exceptions) "the discharge of any pollutant by any person shall be unlawful." This prohibition which is central to the entire Act is statutory and requires no promulgation. The Administrator's function is to set the interim levels of pollutant discharge allowable until absolute cessation is required. Effluent limitations are both required by § 301 and made enforceable against violators by criminal and civil penalties under § 309. Section 309(a) specifically provides for enforcement of any "limitation which implements section 301. . . ." 33 U.S.C. § 1319(a) (Supp. III, 1973). The drafters' intent that the Administrator promulgate such standards is made clear by § 509 (quoted in full above) which specifically provides for review of the Administrator's action "in approving or promulgating any effluent limitation or other limitation under section 301 . . . ." § 509(b)(1)(E), 33 U.S.C. § 1369(b)(1)(E) (Supp. III, 1973).
 
 
 162
 Further, if anything more be needed, the Administrator is given wide authority to issue regulations. Section 501(a) specifically provides: " The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this Act." Under this statute, as we read it, the Administrator has no more important function than carrying out the fundamental purposes of the Act spelled out in § 301.[4]
 
 
 163
 This is demonstrated by the fact that both the federal and state permit programs called for by § 402 are required to be in compliance with "the requirements . . . of § 301." There is no such command applicable to § 304. Thus, without the national standards required by § 301, the fifty states would be free to set widely varying pollution limitations. These might arguably be different for every permit issued.
 
 
 164
 In sum, giving effect to the argument advanced by amici and the Eighth Circuit's CPC International opinion would effectively emasculate the act. The plainly expressed purpose of Congress to require nationally uniform interim limitations upon like sources of pollution would be defeated. States would be motivated to compete for industry by establishing minimal standards in their individual permit programs. Enforcement would proceed on an individual point source basis with the courts inundated with litigation. The elimination of all discharge of pollutants by 1985 would become the impossible dream.
 
 
 165
 In all of these respects, the interpretation sought by amici curiae is violative of what we deem to be clearly expressed Congressional intent. For these reasons, and those set forth in parts I and II of this opinion, we reject the no jurisdiction holding of the Eighth Circuit[5] and join the Third, Fourth, Seventh and Tenth Circuits in holding that the United States Courts of Appeals have jurisdiction to review the actions of the EPA Administrator. American Iron & Steel Institute v. EPA, 526 F.2d 1027 (3d Cir. 1975); E. I. duPont de Nemours & Co. v. Train, 528 F.2d 1136 (4th Cir. 1975); American Meat Institute v. EPA, 526 F.2d 442 (7th Cir. 1975); American Petroleum Institute v. EPA, 526 F.2d 1343 (10th Cir. 1975).
 
 
 166
 2. Simultaneous Issuance. Petitioners' primary attack (as opposed to that of amici curiae) upon EPA's interpretation of the act concerns the Agency's telescoping of the requirements of § 301 and § 304(b) so that the "guidelines" called for by § 304(b) were issued at the same time as the "effluent limitations" called for by § 301. The petitioners argue that the Administrator violated the Act by failing to publish the guidelines first and the limitations thereafter as a subsequent "phase" and that by seeking to satisfy the statutory requirements in one document, he has succeeded in publishing regulations which were valid neither as guidelines under § 304(b) nor as limitations under § 301.
 
 
 167
 We agree with petitioners that one very logical interpretation of the statute is that it contemplates issuance of the guidelines first and the limitations afterwards. This is particularly true since the limitations are required to be based upon the guidelines. The two sections of the statute with which we are currently concerned, however, contain only one time requirement as to issuance of the guidelines and the limitation. In § 304(b) the Statute requires the Administrator to publish "guidelines for effluent limitations" within "one year of enactment of this title."
 
 
 168
 The Act became effective October 18, 1972, and the effluent limitations contained in Appendix B were promulgated nearly six months late on March 12, 1974, to be effective May 20, 1974. 40 C.F.R. §§ 407.10-407.56 (1975). While the statute sets no date for publication of the effluent limitations, they are required by § 301 to be made effective as legally enforceable on industries which were point sources for pollutants at least by July 1, 1977. The Administrator had obviously not been able to achieve the time limitation mandated by the Act as to the guidelines. If he had continued to delay issuance of effluent limitations, he would have been subject to the charge of giving inadequate time to industry for ordering and manufacturing equipment and constructing facilities which would be required to meet the effluent limitations by the July 1977 deadline.
 
 
 169
 It seems clear to us that the Administrator, having already failed to meet the statutory deadline for issuance of the guidelines, elected to take a shortcut. Our questions are: Did that shortcut represent an impermissible interpretation of the Act, and, as claimed by plaintiffs, does that shortcut require our invalidation of both the § 304 guidelines and the § 301 limitations which are under attack in this case?
 
 
 170
 We answer both of these questions in the negative.
 
 
 171
 As to both § 304 guidelines and § 301 effluent limitations, the essentials of informal rule-making had been carried out by the Administrator. The industry affected had had full opportunity (in all except one respect affecting the fecal coli standard) to offer comment and, indeed, as this record demonstrates, had done so both before and after the publication of the proposed rule. We can find no deprivation of petitioners' statutory rights in the procedure followed. Invalidation would have as its principal effect simply further delay of the implementation of the national policy of purification of America's waters.
 
 
 172
 Additionally, however, we observe that the Administrator's interpretation of this complex Act[6] is not without logic. The statute contains no language which forbids the issuance of § 304(b) guidelines and § 301 limitations in the same document on the same day. Obviously, the guidelines and the effluent limitations are closely related. To propose each separately through separate rulemaking procedures would have occasioned considerable additional delay. Congressional insistence upon prompt action by the Administrator in implementing the statutory purposes may be found throughout both the legislative history and the terms of the Act itself. Such insistence doubtless came to weigh heavily on the Administrator; and, indeed, it does upon us.
 
 
 173
 Under these circumstances, we think the language recently employed by the Supreme Court pertaining to the giving of weight to the administrative interpretation of statutory language is relevant. In dealing with a problem of interpretation of a similar statute calling for purification of the ambient air (§ 110 of the Clean Air Act Amendments of 1970, 42 U.S.C. § 1857c-5) the Supreme Court said:
 
 
 174
 We therefore conclude that the Agency's interpretation of §§ 110(a)(3) and 110(f) was "correct," to the extent that it can be said with complete assurance that any particular interpretation of a complex statute such as this is the "correct" one. Given this conclusion, as well as the facts that the Agency is charged with administration of the Act, and that there has undoubtedly been reliance upon its interpretation by the States and other parties affected by the Act, we have no doubt whatever that its construction was sufficiently reasonable to preclude the Court of Appeals from substituting its judgment for that of the Agency. Udall v. Tallman, 380 U.S. 1, 16-18 (85 S.Ct. 792, 801-802, 13 L.Ed.2d 616) (1965); McLaren v. Fleischer, 256 U.S. 477, 480-481 (41 S.Ct. 577, 578, 65 L.Ed. 1052) (1921). We are not persuaded to the contrary by any of the arguments advanced by respondents or by the courts of appeals which have rejected § 110(a)(3) as authority for granting variances.
 
 
 175
 Train v. Natural Resources Defense Council, 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975).
 
 
 176
 See Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).
 
 
 177
 In accordance with the Supreme Court's language, we conclude that the Administrator's decision to issue "guidelines" under § 304 and "effluent limitations" under § 301 through the same procedures, on the same day, and in the same document was a permissible interpretation of the statute which we are required to accept.
 
 
 178
 3. National Effluent Limitations. All industry participants in this case claim that the Act should be construed to require the Administrator to set guidelines and limitations for individual point sources of pollutant discharges rather than by categories and subcategories of industry as the Administrator has done. We have already partially answered this contention. As shown in Part II of this opinion, Congress considered and specifically rejected this very argument. While the statutory language employed referred to "categories" and "classes" of industry, we perceive no error of interpretation in the Administrator's setting "guidelines" and " effluent limitations" for "categories" and "subcategories." As we have pointed out in Parts I and II, both the legislative history of the Act and its statutory structure and language mandate our rejecting the argument that the Act required the Administrator to set "guidelines" and "effluent limitations" for individual plants. We believe that Congress intended individual plant considerations to be taken into account within the nationally set effluent limitations in the granting of state permits under §§ 402(b) and (c), or the granting of federal permits under § 402(a)(1). Additionally, tightly drawn variance procedures are provided for 1983 limitations by § 301(c) and for 1977 standards by 40 C.F.R. §§ 407.42 and 407.52 (1975).
 
 
 179
 Our primary reliance in deciding this issue is on the statutory language and the legislative history detailed in Parts I and II of this opinion. But here, as in dealing with Simultaneous Issuance (Part III, 2, supra ), we are guided by the Supreme Court's Instruction in Train v. Natural Defense Council, supra. The interpretation of the Administrator is "at the very least sufficiently reasonable that it should have been accepted by the reviewing courts." Train v. Natural Defense Council, supra at 75, 95 S.Ct. 1470.
 
 
 180
 We note that again as to this issue we are at odds with the view expressed in the Eighth Circuit in CPC International, Inc. v. Train, 515 F.2d 1037-42 (8th Cir. 1975). But we find strong support for our position in the Fourth, Seventh, and Third Circuits in E. I. duPont de Nemours & Co. v. Train, --- F.2d ---- (4th Cir. 1976); American Meat Institute v. EPA, 526 F.2d 442 (7th Cir. 1975); American Iron & Steel Institute v. EPA, 526 F.2d 1027 (3d Cir. 1975). In our view any interpretation of this profoundly important statute which denied the Environmental Protection Agency the power to set nationally effective effluent standards would be a clear refusal to follow the intent of the Congress and a gross misinterpretation of the statute itself.
 
 
 181
 4. Canadian Plants. Petitioners contend that the Administrator violated the Act by using two Canadian plants as "exemplary plants" for establishing § 304 guidelines and § 301 effluent limitations. On inspection of the statute we are able to find no prohibition, either direct or implied, against the employment of technology developed or used in foreign countries. Petitioner cites no such prohibition to us.
 
 
 182
 The Act does not prescribe with great particularity how the 1977 "best practicable technology" or the 1983 "best available technology" is to be ascertained. We have quoted in Part II of this opinion (p. 117, supra ) language which suggests that 1977 limitations should be set in relation to an average of the best performers in the industrial category concerned and that the 1983 limitations should be set in relation to the best performer. These statements, however, are modified by language indicating great discretion on the part of the Administrator to determine what technology is "practicable" or "available," and to issue limitations more stringent than any then being achieved. Thus the Senate Report dealing with this subject states:
 
 
 183
 It is acknowledged that in those industrial categories where present practices are uniformly inadequate, the Administrator may determine best practicable to require higher levels of control than any currently in place if he determines the technology to achieve those higher levels can be practicably applied.
 
 
 184
 Leg.Hist. at 1468.
 
 
 185
 As used in this bill the concept "best available control technology" is intended to mean that the Administrator should examine the degree of effluent control that has been or can be achieved through the application of technology which is available or normally can be made available. This does not mean that the technology must be in actual routine use somewhere. It does mean that the technology must be available at a cost and at a time which the Administrator determines to be reasonable, and that the technology has been adequately demonstrated if not routinely applied.
 
 
 186
 Leg.Hist. at 1469-70.
 
 
 187
 We find that the only limit placed on the Administrator is that the technology employed by him in setting limitations be available to the industrial category concerned. No argument is made to us that the technology employed by the two "exemplary" Canadian plants is not fully available to the plants operated by petitioners. We do not think that the statutory terms "best practicable technology" or "best available technology" can appropriately be interpreted to exclude consideration of technology available in plants in the same industry across a national boundary separating the United States from a friendly neighbor. Technology in the modern world knows few boundaries the United States-Canadian boundary perhaps least of all.
 
 IV. ABUSE OF DISCRETION
 
 188
 In this section we shall deal with petitioners' claims that in various ways the Administrator abused his discretion in formulating the guidelines and effluent limitations for the potato processing industry.
 
 
 189
 1. The Standard of Review. The parties are in agreement that these issues must be reviewed under § 10(e)(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1970). This section provides that the reviewing court shall:
 
 
 190
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be
 
 
 191
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 192
 See Essex Chemical Corp. v. Ruckleshaus, 158 U.S.App.D.C. 360, 486 F.2d 427, 434 (1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).
 
 
 193
 This standard of review has been explicated by the Supreme court:
 
 
 194
 The court is first required to decide whether the Secretary acted within the scope of his authority. Schilling v. Rogers, 363 U.S. 666, 676-677 (80 S.Ct. 1288, 1295-1296, 4 L.Ed.2d 1478) (1960). This determination naturally begins with a delineation of the scope of the Secretary's authority and discretion. L. Jaffe, Judicial Control of Administrative Action 359 (1965). As has been shown, Congress has specified only a small range of choices that the Secretary can make. Also involved in this initial inquiry is a determination of whether on the facts the Secretary's decision can reasonably be said to be within that range. The reviewing court must consider whether the Secretary properly construed his authority to approve the use of parkland as limited to situations where there are no feasible alternative routes or where feasible alternative routes involve uniquely difficult problems. And the reviewing court must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems.
 
 
 195
 Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Jaffe, supra, at 182. See McBee v. Bomar, 296 F.2d 235, 237 (CA6 1961); In re Josephson, 218 F.2d 174, 182 (CA1 1954); Westerm Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Cal.1968). See also Wong Wing Hang v. Immigration and Naturalization Serv., 360 F.2d 715, 719 (CA2 1966). Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.
 
 
 196
 The final inquiry is whether the Secretary's action followed the necessary procedural requirements. Here the only procedural error alleged is the failure of the Secretary to make formal findings and state his reason for allowing the highway to be built through the park.
 
 
 197
 Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-17, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).
 
 
 198
 See Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc., 419 U.S. 281, 285-86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).
 
 
 199
 2. Information and Guidelines Under § 304. Petitioners' attack upon the Administrator's actions in relation to the information and guideline provisions of § 304 are primarily concerned with claims of the inadequacy of his economic analysis and his failures to allow adequate public comment. We find that the Administrator's analysis of the economics of pollution control measures as applied to this industry was adequate and that, in all but one respect, ample opportunity for the industry to participate in the process of informal rule-making had been provided.
 
 
 200
 The Environmental Protection Agency's compliance with the Information and Guideline functions mandated by § 304 include the following measures applicable to this case:
 
 
 201
 (a) On August 6, 1973, EPA published a Notice of Public Review Procedures at 38 Fed.Reg. 21202. This notice advised that EPA had begun its task of reviewing and defining various industrial categories subject to the Act, employing the assistance of private contractors. According to the notice, contractors' technical studies had been completed for numerous point source categories, including canned and preserved fruits and vegetables processing. These studies had been circulated among the relevant industries, and the notice solicited further comments. EPA announced that upon conclusion of review of the contractors' studies, it would publish proposed regulations identifying the level of effluent reduction achievable for existing point sources by 1977 and 1983 and for new point sources. Additionally, EPA would issue a draft report in support of the proposed regulations.
 
 
 202
 (b) The contractor's study, relevant here, entitled Draft Development Document for Effluent Limitations Guidelines for the Canned and Preserved Fruits and Vegetables Industry was prepared by a private contractor, the Ben Holt Co., and published in July 1973. The August 6, 1973, notice solicited comment on this report. The Draft Development Document identified two subcategories of the industry referred to above, the Frozen Potato Products Subcategory and the Dehydrated Potato Products Subcategory, which are represented in this case by the petitioners. It also identified the pollutants produced by the industrial processes concerned: BOD5 (Biochemical Oxygen Demand), TSS (Total Suspended Solids), and pH (measure of hydrogen ion concentration).
 
 
 203
 The Draft Development Document defined means for controlling, reducing, and eliminating the discharge of such pollutants, made a study of cost factors applicable to these measures and set out proposed guidelines for § 301 effluent limitations which it deemed consistent with "the best practicable technology currently available" for 1977 (§ 304(b)(1)), and "the best available technology" for 1983 and new plants (§ 304(b)(2) and § 306). See also § 307(c).
 
 
 204
 (c) On November 9, 1973, EPA published a Notice of Proposed Rule Making for the subcategories concerned here. 38 Fed.Reg. 31076 (1973). It expressly cited § 301(b) (effluent limitations), § 304(b) (guidelines for effluent limitations), § 306 (new plant standards), and § 307(c) (pretreatment standards for new sources) as legal authority for the proposed rule-making. The notice identified the petitioners, American Frozen Food Institute and Potato Processors of Idaho, as parties whose comments upon a draft report had already been considered.
 
 
 205
 (d) On March 21, 1974, EPA promulgated the effluent limitation guidelines, the effluent limitations for existing sources, and the standards of performance and pretreatment standards for new sources, 40 C.F.R. §§ 470.40-470.56 (1975), (See Appendix B) which are the subject of attack in this litigation. Concurrently in March of 1974 EPA also published a 215-page document entitled Development Document for Effluent Limitations, Guidelines and New Source Performance Standards for Apple, Citrus and Potato Processing Segment of the Canned and Preserved Fruits and Vegetables Point Source Category (hereinafter Development Document ).
 
 
 206
 The Administrator clearly followed proper rule-making procedures as set forth in the Administrative Procedure Act, 5 U.S.C. § 553 (1970), in setting guidelines and effluent limitations. Petitioners' claims of procedural inadequacies in the adoption of the guidelines and effluent limitations must be rejected in all except one minor respect.
 
 
 207
 By the publication of the Proposed Regulations on November 9, 1973, the Administrator issued an open invitation for further public and industry comment upon the technological and economic aspects of the program. What the industry failed to present to the Administrator during rule-making procedures when specifically asked to comment cannot now be urged a basis for invalidation of the § 304 standards or the § 301 effluent limitations.
 
 
 208
 Nor do we find any merit in the argument that the Administrator must delay application of the final regulation and solicit comments thereon because this regulation differs from, indeed is consistently less stringent than, the proposed regulation. The technical basis for the regulation was made readily available to petitioners and the proposed regulation fully informed them to the terms which might be imposed. On this topic this court has previously stated:
 
 
 209
 The requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule it proposed, partly at least in response to submissions.[51]
 
 
 210
 51. A contrary rule would lead to the absurdity that in rule-making under the APA the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary.
 
 
 211
 International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 632 n. 51 (1973).
 
 
 212
 In one instance, however, the EPA has clearly failed to solicit or allow for public comment. The Development Document identified only three pollutants as to which measures of control were proposed. In the final regulation for the industry applicable to 1983 "best available" standards, EPA added a fourth pollutant, fecal coli, and prescribed a limitation for it. No prior notice of intention to add fecal coli to the list of controlled pollutants had been given to the industry or the public and, of course, no comment on any proposed standard had been solicited or received. This failure, we believe, was violative of the Administrative Procedure Act, 5 U.S.C. § 553 (1970), which in all other respects the Administrator has properly construed as requiring publication of proposed standards and the opportunity for industry and public comment.
 
 
 213
 As to this pollutant, remand to the Administrator for reconsideration consistent with the notice and comment requirements of the Administrative Procedure Act is necessary.
 
 
 214
 3. Effluent Limitations Under § 301. The effluent limitations ultimately adopted by the Administrator were as follows:
 
 
 215
 Frozen Potato Products Subcategory 1977 Standards
 (best practicable technology)
----------------------------------------------------------------
 Effluent limitations
 ----------------------------------------------
 Average of daily
 values for 30
 consecutive
 Effluent Maximum for days shall not
characteristic any 1 day exceed--
----------------------------------------------------------------
 Metric units (kilograms per 1,000 kg
 of raw material)
 ----------------------------------------------
BOD5 ...................... 2.80 1.40
TSS ....................... 2.80 1.40
pH .............. Within the range 6.0 to 9.0.
 ----------------------------------------------
 English units (pounds per 1,000 lb.
 of raw material)
 ----------------------------------------------
BOD5 ...................... 2.80 1.40
TSS ....................... 2.80 1.40
pH .............. Within the range 6.0 to 9.0.
----------------------------------------------------------------
 40 C.F.R. Sec. 407.42 (1975).
 1983 and New Source Standards
 (best available technology)
----------------------------------------------------------------
 Effluent limitations
 ----------------------------------------------
 Average of daily
 values for 30
 consecutive
 Effluent Maximum for days shall not
characteristic any 1 day exceed--
----------------------------------------------------------------
 Metric units (kilograms per 1,000 kg
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coliform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
 ----------------------------------------------
 English units (pounds per 1,000 lb.
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coliform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
----------------------------------------------------------------
 40 C.F.R. Secs.407.43, 407.45 (1975).
---------------- ----------------
 Dehydrated Potato Products Subcategory 1977 Standards
 (best practicable technology)
----------------------------------------------------------------
 Effluent limitations
 ----------------------------------------------
 Average of daily
 values for 30
 consecutive
 Effluent Maximum for days shall not
characteristic any 1 day exceed--
----------------------------------------------------------------
 Metric units (kilograms per 1,000 kg
 of raw material)
 ----------------------------------------------
BOD5 ...................... 2.40 1.20
TSS ....................... 2.80 1.40
pH .............. Within the range 6.0 to 9.0.
 ----------------------------------------------
 English units (pounds per 1,000 lb.
 of raw material)
 ----------------------------------------------
BOD5 ...................... 2.40 1.20
TSS ....................... 2.80 1.40
pH .............. Within the range 6.0 to 9.0.
----------------------------------------------------------------
 40 C.F.R. Sec. 407.52 (1975).
 1983 and New Source Standards
 (best available technology)
----------------------------------------------------------------
 Effluent limitations
 ----------------------------------------------
 Average of daily
 values for 30
 consecutive
 Effluent Maximum for days shall not
characteristic any 1 day exceed--
----------------------------------------------------------------
 Metric units (kilograms per 1,000 kg
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coliform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
 ----------------------------------------------
 English units (pounds per 1,000 lb.
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coliform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
----------------------------------------------------------------
 
 
 216
 40 C.F.R. Secs. 407.53, 407.55 (1975).
 
 
 217
 In addition to petitioners' attack upon the effluent limitations on procedural grounds, they also attack them substantively by arguing that the EPA's technological and economic studies upon which these standards are based are either faulty or inadequate. They also claim that the effluent limitations do not provide a "range" for state permit implementation as contemplated by Congress and that they make too little provision for the variability factor in the operation of the proposed effluent treatment program.
 
 
 218
 As a background for our treatment of these issues, we note three important facts:
 
 
 219
 (1) Petitioners do not dispute EPA's contention that it has properly identified the principal pollutants from the industry, namely, BOD5, TSS and pH.
 
 
 220
 (2) Petitioners do not dispute the existence or efficacy of the technology relied upon by EPA to reduce or eliminate the discharge of these pollutants (although they do dispute the consistency of the remedy under all conditions).
 
 
 221
 (3) Petitioners (while claiming that EPA's economic analysis is inadequate) do not argue that the § 301 standards outlined above are such as to threaten the economic viability of either the industry or any plant now operating therein.
 
 
 222
 EPA's Development Document defines the major pollutants as follows:
 
 
 223
 Rationale for Selection of Major Parameters
 
 Biochemical Oxygen Demand
 
 224
 This parameter is an important measure of the oxygen utilized by microorganisms in the aerobic decomposition of the wastes at 20o C over a five day period. More simply, it is an indirect measure of the biodegradability of the organic pollutants in the waste. BOD5 can be related to the depletion of oxygen in a receiving stream or to the requirements for waste treatment.
 
 
 225
 If the BOD5 level of the final effluent of a processing plant into a receiving body is too high, it will reduce the dissolved oxygen level in that stream to below a level that will sustain most fish life; i. e. below about 4 mg/1. Many states currently restrict the BOD5 of effluents to below 20 mg/1 if the stream is small in comparison with the flow of the effluent. A limitation of 200 to 300 mg/1 of BOD5 is often applied for discharge to municipal sewer, and surcharge rates often apply if the BOD5 is above the designated limit.
 
 Suspended Solids
 
 226
 This parameter measures the suspended material that can be removed from the waste waters by laboratory filtration, but does not include coarse or floating matter than can be screened or settled out readily. Suspended solids are a visual and easily determined measure of pollution and also a measure of the material that may settle in tranquil or slow moving streams. A high level of suspended solids is an indication of high organic pollution.
 
 
 227
 pH is an important parameter for providing in-process quality control for recycling of process water. Biological treatment systems operate effectively at a pH range between 6.0 and 9.0. These systems can be rendered ineffective by intermittent dumping of highly acidic or highly alkaline wastes such as caustic tanks used for peeling.
 
 
 228
 Development Document at 79-80.
 
 
 229
 The Development Document also contains a summary of treatment technology:
 
 Levels of Treatment Technology
 
 230
 For the purpose of determining the cost effectiveness of various levels of treatment it was necessary to select practical treatment systems to achieve these levels. The system design used to obtain a given level of treatment varies from subcategory to subcategory and there are numerous combinations of treatment steps that will achieve the same level of treatment. In general the treatment systems consist of one or more of the fine classes of treatment technology: preliminary, primary, secondary, advanced, and ultimate disposal.
 
 
 231
 Preliminary Treatment: Screens are preliminary treatment and are used to remove solids from the waste effluent streams as they are discharged from the processing plant. The screening of the waste effluent stream from a food processing plant is normally the first step in the treatment system and is the most economical method of removing large solids. This removal of solids protects other equipment from plugging or damage and reduces the size of other solids handling units. There are various types of screens which are used in these plants. The vibrating screen equipped with a 20 to 40 mesh screen cloth is generally used. In recent years because more municipal sewer assessments are based on the amount of suspended solids in the effluent and, also, because of increased emphasis on reuse of process water, there has been a concerted effort on the part of the food processor to use finer and finer mesh screens.
 
 
 232
 Primary Treatment: Primary treatment is, also, used to remove solids from the waste effluent streams. Primary treatment includes sedimentation units with and without sludge disposal to remove settleable solids not removed in the preliminary screening. A clarifier of either circular or rectangular design is used for the removal of floatable and settleable solids. These clarifiers are equipped with mechanical scrapers to assist in the removal of solids that settle to the bottom or float on the top. The volume of solids that is removed from the clarifier is further concentrated by a rotary vacuum filter or a centrifuge. The concentrated solids can, usually, be sold as animal feed. Design criteria for estimating cost of primary systems for each typical size of each subcategory are primarily waste water flow and suspended solids loading (See Tables 19-21).
 
 
 233
 Primary treatment is not, generally, used in the apple or citrus industry. If a primary treatment system is present at an apple or citrus plant, it is, usually, designed without sludge disposal. In the potato processing industry, primary treatment with clarifier sludge concentration is necessary and practicable because of the high suspended solids loading. It is common practice in the potato industry to utilize dual primary clarifiers. One clarifier, is used to recover solids from the process waste water. Another clarifier is used to settle silt and remove mud from the raw potato wash water. The process waste water solids are collected and concentrated by a rotary vacuum filter. In the cost figures given in Table 28, dual clarifiers and a rotary vacuum filter are included in the sedimentation with sludge recovery cost estimates for both frozen and dehydrated potato plants.
 
 
 234
 Secondary (Biological) Treatment: Biological treatment is a secondary treatment system which is employed for a high reduction of BOD from the waste effluent stream. To achieve this high reduction in BOD a number of different biological systems may be employed: biological filters, activated sludge, aerated lagoons, anaerobic lagoons, and shallow lagoons.
 
 
 235
 Biological treatment systems are best practicable technology and multiple combinations of biological treatment systems are best available technology. The design parameters for these treatment systems are primarily total waste water flow and BOD loading (See Tables 19-21). The estimation of cost for each typical system size in each subcategory are based on these criteria.
 
 
 236
 Sand filtration, carbon absorption, microscreening, ion exchange, electrodialysis, reverse osmosis and ultra filtration have been considered for the further reduction in BOD and the removal of undesirable soluble components from the waste stream to permit water recycle or reuse. The advanced treatment was considered as an additional component to the best practicable biological treatment system to attain best available effluent reduction.
 
 
 237
 Ultimate Disposal: For the zero discharge of pollutants, land disposal is a technology currently being used by apple, citrus and potato processors when sufficient and suitable land is available. Both land flooding and spray irrigation are accepted methods of disposal and have been used as the basis of cost estimates. The primary design parameter for irrigation systems is waste water flow (See Tables 19-21). Evaporative ponds and percolation lagoons are, also, an accepted form of ultimate disposal but have not been used in ultimate disposal cost estimates.
 
 
 238
 Development Document at 133-34.
 
 
 239
 The Environmental Protection Agency recommends for the 1977 "best practicable technology" for the potato industry the use of water management preliminary screening primary treatment and secondary treatment. All of these methods of pollution control are much more fully discussed and explained in the Development Document. Development Document at 159, 161.
 
 
 240
 Interestingly enough, the present controversy affects only about one-third of the plants in the potato processing industry. Fifty-seven per cent of the plants surveyed were found already to be using land treatment and an additional 10% were using municipal waste treatment systems which serve to accomplish the ultimately desired no-discharge standard.[7]
 
 
 241
 As to the economic impact of the recommended treatment for the industry, EPA published in October 1973 a document entitled Economic Analysis of Proposed Effluent Guidelines, Fruit and Vegetable Processing Industry. This document was issued in conjunction with the publication of the Proposed Rules; and, as made clear in the Notice of Proposed Rule Making, it was publicly available. The Notice of Proposed Rule Making contained the following summary of the detailed economic analysis:
 
 
 242
 (v) Economic impact analysis. A significant portion of the industry has already instituted some of the waste management alternatives, particularly biological treatment systems and product recovery practices which aid in pollution control.
 
 
 243
 The investment costs of meeting the 1977 level of effluent reduction by the use of biological treatment systems such as aerated lagoons are estimated to be $0.06 million for the apple juice subcategory, $0.36 million for the apple products subcategory, $1.78 million for the citrus products subcategory, $1.57 million for the frozen potato products subcategory, and $1.70 million for the dehydrated potato products subcategory.
 
 
 244
 The investment costs of meeting the 1977 level of effluent reduction by the use of biological systems such as activated sludge are estimated to be $0.55 million for apple juice, $2.39 million for apple products, $5.58 million for citrus products, $2.96 million for frozen potato products, and $3.03 million for dehydrated potato products.
 
 
 245
 The investment costs of meeting the 1977 level of effluent reduction by the use of land treatment systems (including land) such as spray irrigation are estimated to be $0.32 million for apple juice, $1.47 million for apple products, $4.39 million for citrus products, $2.89 for frozen potato products, and $2.52 million for dehydrated potato products.
 
 
 246
 The incremental investment costs of meeting the 1983 level of effluent reduction by the use of biological treatment systems such as several aerated lagoons and polishing lagoons are estimated to be $0.13 million for the apple juice subcategory, $1.34 million for the apple products subcategory, $5.81 million for the citrus products subcategory, $2.57 million for the frozen potato products subcategory, and $2.13 million for the dehydrated potato products subcategory.
 
 
 247
 The incremental investment cost of meeting the 1983 level of effluent reduction by the use of biological plus advanced treatment such as activated sludge, aerated lagoons, and multi-media or sand filtration is $0.37 million for apple juice, $1.63 million for apple products, $4.14 million for citrus products, $1.86 million for frozen potato products, and $1.87 million for dehydrated potato products.
 
 
 248
 The total estimated investment costs for the five subcategories to achieve the 1977 level of effluent reduction range from $17.1 million to $26.1 million, including $11.6 million for land and land treatment facilities. This investment cost range amounts to a cost of from $3.40 to $5.20 per annual ton of processing capacity and from 1.4 to 2.1 percent of the estimated apple, citrus and potato industry investment of.$1.2 billion. The cost of achieving the proposed levels of pollutant discharge control for 1977 would be equivalent to 2.3 to 3.5 percent of the present retail price of the products considered in these subcategories.
 
 
 249
 The incremental investment costs for five apple, citrus and potato subcategories to achieve the 1983 level of effluent reduction are estimated to range from $9.9 million to $12.0 million. This range in investment cost amounts to a cost of from $1.90 to $2.30 per annual ton of processing capacity and from 0.8 to 1.0 percent of the estimated industry investment. The cost of achieving the proposed levels of pollutant discharge control for 1983 would be equivalent to 1.3 to 1.6 percent of the present retail price of the products considered in these subcategories.
 
 
 250
 The combined investment costs for the five apple, citrus and potato subcategories to achieve both the 1977 and the 1983 levels of effluent reduction are estimated to range from $29 million to $36 million. This combined cost amounts to a cost of between $5.70 and $7.20 per annual ton of processing capacity and between 2.4 and 3.0 percent of the estimated industry investment. The combined cost of achieving the proposed levels of pollutant discharge control for 1977 and 1983 would be equivalent to 3.8 to 4.9 percent of the present retail price of the products considered in these subcategories.
 
 
 251
 Non-water quality impacts of the pollution control systems were analyzed and found to be of little consequence. Energy requirements of the industry are relatively low: power required to operate the more refined mechanically aerated biological systems will increase consumption by considerably less than 10.0 percent. Solid wastes from treatment sludges and some odor from treatment systems are encountered, but no substantial impact can be identified. It has been demonstrated that most solid wastes from these subcategories can be converted to animal feed and this is the recommended method of dealing with the solid wastes derived from these subcategories.
 
 
 252
 It should be noted that a precise study of economic impact is difficult due to numerous other economic forces at work within an industry, and because of the great variability experienced from plant-to-plant in such factors as pollution control costs, profitability, and return on investment. In an economic study such as this, it is difficult to deal with these factors on an individual plant basis.
 
 
 253
 It is not expected that any significant economic impact would result from imposing the effluent limitation requirements of discharge of process waste water pollutants to navigable waters on all covered segments of this category by 1977 (best practicable control technology for most industry segments). Because of this conclusion, we judge that the proposed guidelines for 1977, 1983 and new sources are economically achievable. The small price increases projected will probably be fully passed on to the consuming public, since there are no substitutable products.
 
 
 254
 38 Fed.Reg. 31078-79 (1973).
 
 
 255
 After receipt of industry comments, EPA found no need to amend its overall estimates as to total economic impact of the 1977 and 1983 limitations. Our own review of petitioners' arguments does not disclose any industry material which serves to persuade us that EPA has disregarded any available economic information or relied upon any faulty data. Large as the investment costs contemplated above may be, they certainly are not inconsistent with the expectations of Congress. Further, in the final regulation promulgated on March 12, 1974, EPA markedly raised the most important of the permitted levels of effluent discharge and (as will be pointed out below) provided for even less stringent effluent limitations for any plant in the industry that could demonstrate that there were factors which affected it which were "fundamentally different" from those specified in the Development Document.
 
 
 256
 As we have noted, our standard of review is very limited. Properly phrased, our question is: Are the Administrator's actions in establishing effluent limitations under the Act arbitrary, capricious, or an abuse of discretion in that the effluent limitations made effective for 1977, for 1983, and for new plants are not supported by the technological and economic record? Our examination of this voluminous record convinces us that we must answer this question "No."
 
 
 257
 As to a number of subsidiary issues presented by petitioners, we shall be more succinct.
 
 
 258
 Petitioners' contentions that EPA inaccurately and improperly employed economic and technological data from the two Canadian exemplary plants are not supported by the record. Petitioners' economic data argument appears to us to be satisfactorily answered by the Administrator's discussion of this issue in the Preamble to the Regulation, 39 Fed.Reg. 10862 (1974), printed herewith as Appendix B. Further, we agree with EPA that the fact that in-plant processes minimize waste water discharge in one Canadian plant does not prevent its being used as an exemplary plant. Section 304(b) of the Act authorizes the Administrator to consider "process changes." Nor do we find any error in the Administrator's use of a full year's experience with this plant excluding its first year and a half of start-up operation.
 
 
 259
 As to petitioners' argument that EPA disregarded Congressional discussion of a "range" of effluent limitations, we note, first, that no such requirement was enacted in statutory form. Additionally, however, we believe that if there were such a requirement, it would be met by the fact that the permit issuing authority under § 402 (state or federal) will clearly be able to employ any limitation it finds appropriate for a specific plant which falls between a "range" of zero pollutant discharge and the nationally set effluent limitations. As noted by the Third Circuit:
 
 
 260
 In our view, the section 301(b) limitations represent a single number effluent limitation which prescribes the minimum amount of control (the "base level"), or conversely, the maximum amount of effluent discharge (a "ceiling") that is permissible. In determining this "base level," and concomitant pollutant ceiling, the Administrator is to consider the numerous differences in processes and capabilities of point sources. Having determined the "base level," and the "ceiling," he must then promulgate guidelines which are to guide the permit-issuing authorities in deciding whether, and by how much, the limitation to be applied to any individual point source is more stringent than the base level (in terms of requiring more effective technology), and more stringent than the ceiling (in requiring a lower amount of effluent discharge).
 
 
 261
 American Iron and Steel Institute v. EPA, supra, 526 F.2d at 1045. (Footnote omitted.)In addition, permit issuing authorities may also have a range of possible less stringent limitations (subject, of course, to fulfilling the essential purposes of the Act) through exercise of their authority (set out fully below) to exempt certain plants that are able to demonstrate "fundamentally different" factors which affected their performance. 40 C.F.R. §§ 470.42(a), 470.52(a) (1975). See also § 304(c) pertaining to 1983 limitations.
 
 
 262
 The last issue of any appellate significance is petitioners' contention that the Administrator abused his discretion in issuing the effluent limitations by failing adequately to provide for variability in the operation of waste water treatment facilities. From the beginning of our consideration of this case, we have regarded this contention as one of considerable concern. The essence of petitioners' argument is set out in its Reply Brief in this fashion:
 
 
 263
 EPA's effluent regulations for the BOD and TSS parameters in both the frozen potato products and the dehydrated potato products subcategories are based on the annual average BOD and TSS effluent values for three exemplary plants, PO-110, PO-128, and PO-127. The 1977 frozen product limitations for BOD are derived from the highest annual average of the three exemplary plants, while the 1977 dehydrated products BOD limitations are derived from the average of the annual averages of each of the three exemplary plants. For the 1983 and new source effluent limitations, the lowest annual average of the exemplary plants was used as a starting point.
 
 
 264
 Similarly, the 1977 frozen and dehydrated product suspended solids (TSS) effluent limitation is drawn from the highest annual average of two of the exemplary plants, PO-127 and PO-128. The average of the annual averages for TSS at PO-127 and PO-128 was used to calculate the 1983 limitations guidelines and new sources standards in both subcategories.
 
 
 265
 From these annual averages, EPA proceeded to develop the numbers actually found in the regulations. EPA established a number for the maximum monthly average (which it called "average of daily values for 30 consecutive days shall not exceed"), for the 1977, 1983 and new source effluent limitations by applying a factor of 50 percent (multiplying by 1.5) to the appropriate annual average. EPA also established the "maximum for any one day" figure by applying a factor of 100 percent (multiplying by 2.0) to the maximum monthly average determined for the 1977, 1983 and new source limitations. Thus, the maximum daily value is 3 times the annual average. EPA stated that it intended both the 50 and the 100 percent figures to serve as "variability factors" to account for deviations from the long-term (annual) average performances.
 
 
 266
 Although EPA thus recognized that biological treatment plants experience a "natural variation" in performance from the long-term average performance, EPA did not explain why it used a variability factor of 100 percent for the daily maximum to account for this variation.
 
 
 267
 Petitioners then argue that there is a statistically determinable variability factor in treatment plant performance and that EPA employed a variability factor in other industries.
 
 Petitioners conclude:
 
 268
 EPA could have made such calculations to obtain variability factors for its potato processing regulations at issue in this case. It has shown in other industry category regulations that it knows how to do so. Instead, however, it arbitrarily used factors of 1.5 and 2.0 with little or no supporting data in the record.
 
 
 269
 The variability factors of 1.5 for maximum 30-day/average 30-day and 2.0 for maximum day/maximum 30-day (or 3.0 for maximum day/average 30-day) are not high enough for modern activated sludge systems for potato processors operating at the present state of the art. Analysis of data from plants PO-108 and PO-109 indicate that a maximum 30-day to average 30-day ratio of 2.0 to 2.5 and a maximum day to maximum 30-day ratio of 2.5 to 3.0 would be more appropriate.
 
 
 270
 The facts disclosed in this record which favor petitioners as to this issue are:
 
 
 271
 (A) Treatment equipment is subject to breakdown.
 
 
 272
 (B) Biological treatment facilities are subject to at least occasional "upsets" which serve markedly to decrease their effectiveness.
 
 
 273
 (C) Extremely cold weather tends to reduce the effectiveness of biological treatment.
 
 
 274
 (D) Scarcity of immediately available land may affect the ability of some plants to install "holding ponds" which presumably could otherwise be used to balance out the discharge of high concentrations of pollutants.
 
 
 275
 The Environmental Protection Agency's response to this issue is found in part in the Development Document:
 
 
 276
 Reliability, operability and consistency of operation of the waste water treatment processes found to be most frequently used in the fruit and vegetable industry can be high if appropriate designs and operational techniques are employed. The end-of-pipe treatment utilizing biological systems is a well established technology that requires attention to a limited number of variables to insure a high degree of reliability.
 
 
 277
 The most important operational aspects of these biological systems are equipment reliability and attention to operating detail and maintenance. Spare aeration equipment (usually floating surface aerators) improves the possibility of consistent operation; however, many treatment systems have an adequate overcapacity already installed as insurance against the results of equipment failure. It is more desirable to install spare equipment at critical points, for example, sludge return pumps. Perhaps of equal importance is a design that permits rapid and easy maintenance of malfunctioning equipment.
 
 
 278
 Therefore, control of the biological treatment plant and the consistency of the results obtained are largely a matter of conscientious adherence to well-known operational and maintenance procedures. Automatic control of biological treatment plants is far from a practical point. Although in-line instrumentation for measurement of pH, dissolved oxygen, temperature, turbidity and so on, can improve the effectiveness of operation, its use is minimal in the industry's existing waste water treatment plants. Nevertheless, no practical in-line instrumentation can replace the judicious attention to operational details of a conscientious crew of operators.
 
 
 279
 Development Document at 108-09.
 
 
 280
 On the surface it might appear that a per day maximum of 300% of the average annual daily discharge rate would be sufficient to meet the problems described by petitioners, particularly if the operational and alternate equipment suggestions quoted above from EPA's Draft Development Document were followed.
 
 
 281
 We believe, however, that in addition to these recommendations, EPA provided still another safety valve in its final Rules and Regulations. Applicable to both subcategories of the potato processing industry and to all effluent limitations for 1977, new sources and 1983 is the following "adjustment" provision applicable where a discharger submits evidence that there are factors applicable to his plant which are "fundamentally different" from "the factors considered in the establishment of the guidelines":
 
 
 282
 (a) In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with respect to factors (such as age and size of plant, raw materials, manufacturing processes, products produced, treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry. An individual discharger or other interested person may submit evidence to the Regional Administrator (or to the State, if the State has the authority to issue NPDES permits) that factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines. On the basis of such evidence or other available information, the Regional Administrator (or the State) will make a written finding that such factors are or are not fundamentally different from that facility compared to those specified in the Development Document. If such fundamentally different factors are found to exist, the Regional Administrator or the State shall establish for the discharger effluent limitations in the NPDES permit either more or less stringent than the limitations established herein, to the extent dictated by such fundamentally different factors. Such limitations must be approved by the Administrator of the Environmental Protection Agency. The Administrator may approve or disapprove such limitations, specify other limitations, or initiate proceedings to revise these regulations.
 
 
 283
 40 C.F.R. §§ 407.42(a), 407.52(a) (1975).
 
 
 284
 Thus, for example, if a plant presented evidence of a combination of limited land availability and extreme winter temperatures and that EPA's standards had not taken such factors into account, the Regional Administrator or the state would clearly have authority to provide the "variability" which petitioners contend is totally lacking. For these reasons we again hold that no arbitrary or capricious action has been shown.
 
 CONCLUSION
 
 285
 For the reasons outlined, we hold that this court has jurisdiction of this case. We hold, as indicated above, that the Administrator's interpretation of the Act is valid. Further, the Rules and Regulations, dated March 12, 1974, as they apply to the Frozen Potato Products and Dehydrated Potato Products Subcategories are legally valid under the Administrator's interpretations of the Act. The effluent guidelines and effluent limitations set out therein are likewise valid and enforceable, being neither arbitrary, capricious, nor an abuse of discretion, with one exception. For reasons set out earlier in this opinion, the effluent limitation applicable in 1983 to fecal coli is vacated and remanded to the Administrator for further consideration. We retain jurisdiction to hear any dispute which may arise as a result of the Administrator's reconsideration of this issue.
 
 APPENDIX A
 PROPOSED RULES
 ENVIRONMENTAL PROTECTION AGENCY
 
 286
 (40 CFR Part 407)
 
 
 287
 CANNED AND PRESERVED FRUITS AND VEGETABLES PROCESSING
 
 INDUSTRY POINT SOURCE CATEGORY
 Proposed Effluent Limitations Guidelines
 
 288
 Notice is hereby given that effluent limitations guidelines for existing sources and standards of performance and pretreatment standards for new sources set forth in tentative form below are proposed by the Environmental Protection Agency (EPA) for the apple juice subcategory (Subpart A), the apple products subcategory (Subpart B), the citrus products subcategory (Subpart C), the frozen potato products subcategory (Subpart D), and the dehydrated potato products subcategory (Subpart E), of the canned and preserved fruits and vegetables processing industry category of point sources pursuant to sections 301.304(b) and (c), 306(b), and 307(c) of the Federal Water Pollution Control Act, as amended (33 U.S.C. 1251, 1311, 1314(b) and (c), 1316(b), and 1317(c); 86 Stat. 816 et seq.; P.L. 92-500) (the Act).
 
 
 289
 (a) Legal authority. (1) Existing point sources. Section 301(b) of the Act requires the achievement by not later than July 1, 1977, of effluent limitations for point sources, other than publicly owned treatment works, which require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 304(b) of the Act. Section 301(b) also requires the achievement by not later than July 7, 1983, of effluent limitations for point sources, other than publicly owned treatment works, which require the application of best available technology economically achievable which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator pursuant to section 304(b) of the Act.
 
 
 290
 Section 304(b) of the Act requires the Administrator to publish regulations providing guidelines for effluent limitations setting forth the degree of effluent reduction attainable through the application of the best practicable control technology currently available and the degree of effluent reduction attainable through the application of the best control measures and practices achievable including treatment techniques, process and procedure innovations, operating methods, and other alternatives. The regulations proposed herein set forth effluent limitations guidelines, pursuant to section 304(b) of the Act, for the apple juice subcategory (Subpart A), the apple products subcategory (Subpart B), the citrus products subcategory (Subpart C), the frozen potato products subcategory (Subpart D), and the dehydrated potato products subcategory (Subpart E), of the canned and preserved fruits and vegetables processing industry category.
 
 
 291
 (2) New sources. Section 306 of the Act requires the achievement by new sources of a Federal standard of performance providing for the control of the discharge of pollutants which reflects the greatest degree of effluent reduction which the Administrator determines to be achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants.
 
 
 292
 Section 306(b)(1)(B) of the Act requires the Administrator to propose regulations establishing Federal standards of performance for categories of new sources included in a list published pursuant to section 306(b)(1)(A) of the Act. The Administrator published in the Federal Register of January 16, 1973 (38 FR 1624), a list of 27 source categories, including the canned and preserved fruits and vegetables processing industry category. The regulations proposed herein set forth the standards of performance applicable to new sources for the apple juice subcategory (Subpart A), the apple products subcategory (Subpart B), the citrus products subcategory (Subpart C), the frozen potato products subcategory (Subpart D), and the dehydrated potato products subcategory (Subpart E), of the canned and preserved fruits and vegetables processing industry category.
 
 
 293
 Section 307(c) of the Act requires the Administrator to promulgate pretreatment standards for new sources at the same time that standards of performance for new sources are promulgated pursuant to section 306. Sections 407.15, 407.25, 407.35, 407.45, and 407.55, proposed below, provide pretreatment standards for new sources within the apple juice subcategory (Subpart A), the apple products subcategory (Subpart B), the citrus products subcategory (Subpart C), the frozen potato products subcategory (Subpart D), and the dehydrated potato products subcategory (Subpart E), of the canned and preserved fruits and vegetables processing industry category.
 
 
 294
 Section 304(c) of the Act requires the Administrator to issue to the States and appropriate water pollution control agencies information on the processes, procedures or operating methods which result in the elimination or reduction of the discharge of pollutants to implement standards of performance under Section 306 of the Act. The Development Document referred to below provides, pursuant to section 304(c) of the Act, information on such processes, procedures or operating methods.
 
 
 295
 (b) Summary and basis of proposed effluent limitations guidelines for existing sources and standards of performance and pretreatment standards for new sources.
 
 
 296
 (1) General methodology. The effluent limitations guidelines and standards of performance proposed herein were developed in the following manner. The point source category was first studied for the purpose of determining whether separate limitations and standards are appropriate for different segments within the category. This analysis included a determination of whether differences in raw material used, product produced, manufacturing process employed, age, size, waste water constituents and other factors require development of separate limitations and standards for different segments of the point source category. The raw waste characteristics for each such segment were then identified. This included an analysis of: (1) The source, flow and volume of water used in the process employed and the sources of waste and waste waters in the operation, and (2) the constituents of all waste waters. The constituents of the waste waters which should be subject to effluent limitations guidelines and standards of performance were identified.
 
 
 297
 The control and treatment technologies existing within each segment were identified. This included an identification of each distinct control and treatment technology, including both in-plant and end-of-process technologies, which are existent or capable of being designed for each segment. It also included an identification of, in terms of the amount of constituents and the chemical, physical, and biological characteristics of pollutants, the effluent level resulting from the application of each of the technologies. The problems, limitations, and reliability of each treatment and control technology were also identified. In addition, the non-water quality environmental impact, such as the effects of the application of such technologies upon other pollution problems, including air, solid waste, noise, and radiation, were identified. The energy requirements of each control and treatment technology were determined as well as the cost of the application of such technologies.
 
 
 298
 The information, as outlined above, was then evaluated in order to determine what levels of technology constitute the "best practicable control technology currently available," the "best available technology economically achievable" and the "best available demonstrated control technology, processes, operating methods, or other alternatives." In identifying such technologies, various factors were considered. These included the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements) and other factors.
 
 
 299
 The data upon which the above analysis was performed included EPA permit applications, EPA sampling and inspections, consultant reports, and industry submissions.
 
 
 300
 The pretreatment standards proposed herein are intended to be complementary to the pretreatment standards proposed for existing sources of 40 CFR Part 128. The bases for such standards are set forth in the Federal Register of July 19, 1973, 38 FR 19236. The provisions of Part 128 are equally applicable to sources which would constitute "new sources," under section 306 if they were to discharge pollutants directly to navigable waters, except for § 128.133. That section provides a pretreatment standard for "incompatible pollutants" which requires application of the "best practicable control technology currently available," subject to an adjustment for amounts of pollutants removed by the publicly owned treatment works. Since the pretreatment standards proposed herein apply to new sources, §§ 407.15, 407.25, 407.35, 407.45, and 407.55 below amend § 128.133 to require application of the standard of performance for new sources rather than the "best practicable" standard applicable to existing sources under sections 301 and 304(b) of the Act.
 
 
 301
 (2) Summary of conclusions with respect to the apple juice subcategory (Subpart A), the apple products subcategory (Subpart B), the citrus products subcategory (Subpart C), the frozen potato products subcategory (Subpart D), and the dehydrated potato products subcategory (Subpart E), of the canned and preserved fruits and vegetables processing industry category.
 
 
 302
 (1) Categorization. The canned and preserved fruits and vegetables processing industry category was divided into five discrete subcategories for the purpose of developing effluent limitations. These subcategories coincide with a breakdown of the category according to raw material, organic and volumetric waste load and processing operation as outlined in the Development Document for the canned and preserved fruits and vegetables processing industry category. When a plant is subject to effluent limitations covering more than one subcategory, the plant discharge limitation shall be set by proration limitations for each subcategory based on the total raw material covered by each subcategory.
 
 
 303
 (1) Subpart A Apple Juice Subcategory. The chemical composition and physical character of applies are different from either citrus fruits or white potatoes. The processing of apple juice involves a unique sequence of unit operations which result in an organic and volumetric waste load unlike that resulting from other apple production processes or from citrus or potato processes. The water usage and organic waste loads resulting from apple juice production are considerably less than waste water loads resulting from the production of other apple products or from citrus or potato processing operations. These waste water characteristics and factors, such as age and size of plant, plant location, and waste treatability, were found to support an exclusive apple juice subcategory.
 
 
 304
 (2) Subpart B Apple Products Subcategory. The chemical composition and physical character of apples are different from either citrus fruits or white potatoes. The processing of apples into apple products (other than apple juice) involves common unit operations which result in similar waste loads. The water usage and organic waste loads resulting from the production of apple products are higher than wast loads resulting from the production of apple juice and lower than waste loads resulting from white potato processing operations. The biochemical oxygen demand (BOD5 ) from apple product waste water is higher than the BOD5 from citrus waste water but the total suspended solids and water usage are lower than that from citrus waste waters. These waste water differences and the similarities among apple products along with factors such as age and size of plant, plant location and waste treatability support a separate apple product subcategory. Caustic peeled and dehydrated apple products are specifically excluded.
 
 
 305
 (3) Subpart C Citrus Products Subcategory. The chemical composition and physical character of citrus fruits are different from either apples or white potatoes. The processing of citrus fruits into products and co-products involve a number of unit operations which result in similar waste loads. The water usage and organic waste loads resulting from the production of citrus products and co-products are higher than waste water loads resulting from apple juice, or apple products (except biochemical oxygen demand for apple products) and considerably lower than waste water loads resulting from either dehydrated or frozen potato processing operations (except water usage for dehydrated potato products). These waste characteristics among citrus products and co-products along with factors such as age and size of plant, plant location, and waste treatability support a single, separate citrus products subcategory. Pectin and pharmaceutical products are specifically excluded.
 
 
 306
 (4) Subpart D Frozen Potato Products Subcategory. The chemical composition and physical character of white potatoes are different from either apple or citrus fruits. The processing of frozen potato products involves a unique sequence of unit operations which results in an organic and volumetric waste load unlike that resulting from dehydrated potato production processes or from apple or citrus processes. The water usage and organic waste loads resulting from frozen potato processing are considerably higher than waste water loads resulting from the production of dehydrated potato products or from apple or citrus processing operations. These waste water characteristics and factors such as age and size of plant, plant location, and waste treatability were found to support a separate frozen potato products subcategory.
 
 
 307
 (5) Subpart E Dehydrated Potato Products Subcategory. The chemical composition and physical character of white potatoes are different from either apples or citrus fruits. The processing of dehydrated potato products involves a unique sequence of unit operations which results in an organic and volumetric waste load unlike that resulting from frozen potato production processes or from apple or citrus processes. The water usage and organic waste loads resulting from dehydrated potato processing are considerably less than waste water loads resulting from the production of frozen potato products and significantly higher than waste water loads from apple or citrus processing operations (except waste usage from citrus products). These waste water characteristics along with factors such as age and size of plant, plant location, and waste treatability, were found to support a separate dehydrated potato products subcategory.
 
 
 308
 (ii) Waste characteristics. The significant pollutant parameters in waste waters resulting from the apple, citrus and potato processing subcategories of the canned and preserved fruits and vegetables industry category include biochemical oxygen demand (BOD5 ), total suspended non-filterable solids (TSS) and pH.
 
 
 309
 Several other waste water pollutants are formed in apple, citrus or potato processing waste waters but these pollutants are considered to be of lesser importance because available data has indicated these pollutants are normally removed when BOD5 or TSS are removed or they occur in insignificant quantities. Some cooling water is used throughout the fruits and vegetables industry and large amounts of cooling water are used in the processing of citrus products; however, heat is not a discharge problem when the cooling water is combined with the process waste water.
 
 
 310
 Waste water from process steps such as peeling, trimming, slicing, transporting, blanching, and cooking, and water from periodic clean-up procedures are the principle waste water streams in apple, citrus or potato processing. Raw waste load data have been collected on these waste waters for each subcategory of this industry, and information assembled on the treatment procedures required for the waste waters.
 
 
 311
 Three constituents of the waste water from plants within the apple, citrus or potato processing industry have been found which could interfere with, pass through, or otherwise be incompatible with a well designed and operated publicly owned activated sludge or trickling filter waste water treatment plant. Waste water constituents include caustic solutions from peeling operations such as lye dip potato peelers, D'limonene from citrus peel processing operations, and oil from frying operations. Control methods are available and should be used to keep harmful quantities of these materials from being discharged to municipal waste water treatment facilities.
 
 
 312
 (iii) Origin of waste water pollutants in the canned and preserved fruits and vegetables processing industry category. Many of the process steps used in the canning, dehydrating or freezing of fruits and vegetables are common to the industry as a whole. Typically, the fruits or vegetables are received, washed and sorted to prepare them for subsequent processing. Commodities such as apples, citrus and potatoes are then usually peeled when the end product style is to be a solid form (slices, cubes or powder). If the final product is to be a juice or liquid, the peel may not be removed. Subsequent process steps following the peel removal in which water may be used are trimming, slicing, blanching, cooling, cooking, and can washing or cooling. Water transport may be used in one or more parts of the process, and clean-up is common to each fruit and vegetable processing operation. Cooling water is used in large quantities in the citrus products subcategory and it is generally segregated from process water. The character of the process waste clean-up waters are similar in that they contain biodegradable organic matter. Thus, the in-plant control measures and end-of-process treatment techniques are similarly effective in controlling and treating apple, citrus or potato processing wastes.
 
 
 313
 (iv) Treatment and control technology. In-plant procedures to control pollution include strict management control over housekeeping and water use practices, minimization of the intake of water by reuse and recirculation of waste waters and dry clean-up procedures before washdown.
 
 
 314
 "End-of-process" waste water treatment processes include preliminary screening, primary sedimentation, and biological treatment. Land treatment such as spray or flood irrigation is an attractive alternative waste water treatment process for many processors with suitable and sufficient land. Cooling towers are used by numerous citrus processors to recirculate cooling waters.
 
 
 315
 Solid waste control should be considered. Solid residue and sludge are potential problems because of the need for periodic disposal. Solid waste is being handled by processors in each subcategory as animal feed. In a few cases, however, solid waste cannot be handled as feed. In these cases, it must be handled properly to assure no landfill or associated problems develop.
 
 
 316
 Waste water treatment and control technologies have been studied for each subcategory of the industry to determine what is: (a) The best practicable control technology currently available; (b) the best available technology economically achievable; and (c) the best demonstrated control technology, processes, operating methods or other alternatives.
 
 
 317
 Where sufficient quantities of suitable land are available, land treatment such as spray irrigation is recommended as best practicable control technology currently available.
 
 
 318
 Best practicable control technology currently available for the apple juice and apply products subcategories, the citrus products subcategory, and the frozen and dehydrated potato products subcategories includes preliminary screening and biological treatment.
 
 
 319
 For the citrus products subcategory only, it also includes cooling towers for the recirculation of cooling water containing small amounts of BOD5. For the frozen and dehydrated potato products subcategories only, it also includes primary sedimentation of process waste water.
 
 
 320
 The specified level of technology is practicable because it is being practiced by plants in all subcategories using multiple areated lagoons, activated sludge, anaerobic plus aerobic lagoons, trickling filters, trickling filters plus aerated lagoons or activated sludge plus aerated lagoons.
 
 
 321
 Four apple plants including one apple juice processing plant are presently achieving this level of effluent reduction for BOD5 and TSS with biological treatment. Activated sludge, anaerobic plus aerobic lagoons, multiple aerobic lagoons, and trickling filters plus aerated lagoons are the exemplary biological treatment systems.
 
 
 322
 Five citrus product plants are currently achieving this level of effluent reduction for BOD5 and TSS. Two additional citrus processors are meeting the BOD5 limitations only. Multiple areated lagoons, anaerobic plus aerobic lagoons, areated lagoons with trickling filters and activated sludge are the exemplary treatment systems. Of these seven plants, five would not require cooling towers or ponds for barometric cooling waters.
 
 
 323
 One American and two Canadian potato processing plants are able to achieve high levels of effluent reduction for BOD5 and TSS through the utilization of exemplary biological treatment systems. Another American potato processing plant is able to achieve high levels of effluent reduction for BOD5. The exemplary treatment systems are activated sludge, trickling filters, anaerobic plus aerobic lagoons, and multiple aerated lagoons.
 
 
 324
 Thus, biological treatment has been shown to be both practicable and the currently available technology for achieving the 1977 level of effluent reduction for the apple juice and apple products subcategories, citrus products subcategory, and frozen and dehydrated potato products subcategories. In addition, the guidelines can be achieved by land treatment through spray irrigation or flood irrigation or other ultimate disposal technologies as described in the Development Document. Over fifty percent of the plants processing apple juice and apple products and over fifty percent of the apple processing capacity utilize land treatment to dispose of their wastes; at least ten additional apple plants are presently achieving an effluent reduction greater than required by the application of the best practicable control technology currently available through land treatment. Over fifty percent of the citrus and frozen and dehydrated potato processing plants and over fifty percent of the citrus and potato processing capacity utilize land treatment to dispose of their wastes; at least twenty additional citrus plants and twelve additional potato plants are currently achieving an effluent reduction greater than required by the application of the best practicable control technology currently available.
 
 
 325
 Best available control technology economically achievable for the five apple, citrus, and potato subcategories include the best practicable control technology currently available along with additional biological treatment components and in a few cases, advanced treatment such as multi-media or sand filtration.
 
 
 326
 Biological treatment is practiced throughout the apple, citrus and potato industry and sand filtration is practiced in at least one potato plant (England). With present biological treatment systems without advanced treatment methods such as sand filtration, at least one plant in each of the five subcategories is presently achieving the high levels of effluent reduction required by the application of the best available control technology economically achievable.
 
 
 327
 There is an additional fifty percent of the apple, citrus, and potato industry that is presently using land treatment; over forty apple, citrus or potato plants are presently achieving an effluent reduction greater than required by the application of the best available control technology economically achievable and many have no discharge of pollutants to navigable waters. This technology is used with and without holding ponds in Idaho, the Northwest, California, Pennsylvania, Virginia, New York, and Florida. Most other States also have land treatment of the fruits and vegetables industry category. Application of technology for greatly reduced water use will facilitate land disposal. Experience has shown that good management practices assure that land disposal and irrigation systems can be maintained commensurate with crop need and soil tolerance.
 
 
 328
 Treatment required to achieve the best available demonstrated control technology, processes, operating methods or other alternatives for new sources is the same as from best available control technology economically achievable.
 
 
 329
 (v) Economic impact analysis. A significant portion of the industry has already instituted some of the waste management alternatives, particularly biological treatment systems and product recovery practices which aid in pollution control.
 
 
 330
 The investment costs of meeting the 1977 level of effluent reduction by the use of biological treatment systems such as aerated lagoons are estimated to be $0.06 million for the apple juice subcategory, $0.36 million for the apple products subcategory, $1.78 million for the citrus products subcategory, $1.57 million for the frozen potato products subcategory, and $1.70 million for the dehydrated potato products subcategory.
 
 
 331
 The investment costs of meeting the 1977 level of effluent reduction by the use of biological systems such as activated sludge are estimated to be $0.55 million for apple juice, $2.39 million for apple products, $5.58 million for citrus products, $2.96 million for frozen potato products, and $3.03 million for dehydrated potato products.
 
 
 332
 The investment costs of meeting the 1977 level of effluent reduction by the use of land treatment systems (including land) such as spray irrigation are estimated to be $0.32 million for apple juice, $1.47 million for apple products, $4.39 million for citrus products, $2.89 for frozen potato products, and $2.52 million for dehydrated potato products.
 
 
 333
 The incremental investment costs of meeting the 1983 level of effluent reduction by the use of biological treatment systems such as several aerated lagoons and polishing lagoons are estimated to be $0.13 million for the apple juice subcategory, $1.34 million for the apple products subcategory, $5.81 million for the citrus products subcategory, $2.57 million for the frozen potato products subcategory, and $2.13 million for the dehydrated potato products subcategory.
 
 
 334
 The incremental investment cost of meeting the 1983 level of effluent reduction by the use of biological plus advanced treatment such as activated sludge, aerated lagoons, and multi-media or sand filtration is $0.37 million for apple juice, $1.63 million for apple products, $4.14 million for citrus products, $1.86 million for frozen potato products, and $1.87 million for dehydrated potato products.
 
 
 335
 The total estimated investment costs for the five subcategories to achieve the 1977 level of effluent reduction range from $17.1 million to $26.1 million, including $11.6 million for land and land treatment facilities. This investment cost range amounts to a cost of from $3.40 to $5.20 per annual ton of processing capacity and from 1.4 to 2.1 percent of the estimated apple, citrus and potato industry investment of.$1.2 billion. The cost of achieving the proposed levels of pollutant discharge control for 1977 would be equivalent to 2.3 to 3.5 percent of the present retail price of the products considered in these subcategories.
 
 
 336
 The incremental investment costs for five apple, citrus and potato subcategories to achieve the 1983 level of effluent reduction are estimated to range from $9.9 million to $12.0 million. This range in investment cost amounts to a cost of from $1.90 to $2.30 per annual ton of processing capacity and from 0.8 to 1.0 percent of the estimated industry investment. The cost of achieving the proposed levels of pollutant discharge control for 1983 would be equivalent to 1.3 to 1.6 percent of the present retail price of the products considered in these subcategories.
 
 
 337
 The combined investment costs for the five apple, citrus and potato subcategories to achieve both the 1977 and the 1983 levels of effluent reduction are estimated to range from $29 million to $36 million. This combined cost amounts to a cost of between $5.70 and $7.20 per annual ton of processing capacity and between 2.4 and 3.0 percent of the estimated industry investment. The combined cost of achieving the proposed levels of pollutant discharge control for 1977 and 1983 would be equivalent to 3.8 to 4.9 percent of the present retail price of the products considered in these subcategories.
 
 
 338
 Non-water quality impacts of the pollution control systems were analyzed and found to be of little consequence. Energy requirements of the industry are relatively low; power required to operate the more refined mechanically aerated biological systems will increase consumption by considerably less than 10.0 percent. Solid wastes from treatment sludges and some odor from treatment systems are encountered, but no substantial impact can be identified. It has been demonstrated that most solid wastes from these subcategories can be converted to animal feed and this is the recommended method of dealing with the solid wastes derived from these subcategories.
 
 
 339
 It should be noted that a precise study of economic impact is difficult due to numerous other economic forces at work within an industry, and because of the great variability experienced from plant-to-plant in such factors as pollution control costs, profitability, and return on investment. In an economic study such as this, it is difficult to deal with these factors on an individual plant basis.
 
 
 340
 It is not expected that any significant economic impact would result from imposing the effluent limitation requirements of discharge of process waste water pollutants to navigable waters on all covered segments of this category by 1977 (best practicable control technology for most industry segments). Because of this conclusion, we judge that the proposed guidelines for 1977, 1983 and new sources are economically achievable. The small price increases projected will probably be fully passed on to the consuming public, since there are no substitutable products.
 
 
 341
 The report entitled "Development Document for Proposed Effluent Limitations Guidelines and New Source Performance Standards for the APPLE, CITRUS, and POTATO Segment of the Canned and Preserved Fruits and Vegetables Point Source Category" details the analysis undertaken in support of the regulations being proposed herein and is available for inspection in the EPA Information Center, Room 227, West Tower, Waterside Mall, Washington, D.C., at all EPA regional offices, and at State water pollution control offices. A supplementary analysis prepared for EPA of the possible economic effects of the proposed regulations is also available for inspection at these locations. Copies of both of these documents are being sent to persons or institutions affected by the proposed regulations, or who have placed themselves on a mailing list for this purpose (see EPA's Advance Notice of Public Review Procedures, 38 FR 21202, August 6, 1973). An additional limited number of copies of both reports are available. Persons wishing to obtain a copy may write the EPA Information Center, Environmental Protection Agency, Washington, D.C. 20460. Attention: Mr. Philip B. Wisman.
 
 
 342
 (c) Summary of public participation. Prior to this publication, the agencies and groups listed below were consulted and given an opportunity to participate in the development of effluent limitations guidelines and standards proposed for the canned and preserved fruits and vegetables processing industry category. All participating agencies have been informed of project developments. An initial draft of the Development Document was sent to all participants and comments were solicited on that report. The following are the principal agencies and groups consulted: (1) Effluent Standards and Water Quality Information Advisory Committee (established under Section 515 of the Act); (2) All State and U.S. Territory Pollution Control Agencies; (3) National Canners Association; (4) American Frozen Food Institute; (5) Potato Processors of Idaho; (6) Florida Citrus Commission; (7) Florida Canners Association; (8) California-Arizona Citrus League; (9) Council for Agricultural Science and Technology; (10) Frozen Potato Products Institute; (11) American Society of Mechanical Engineers; (12) Hudson River Sloop Restoration, Inc.; (13) Conservation Foundation; (14) Businessmen for the Public Interest; (15) Environmental Defense Fund, Inc.; (16) Natural Resources Defense Counsel; (17) American Society of Civil Engineers; (18) National Wildlife Federation; (19) Water Pollution Control Federation; (20) Ohio River Valley Sanitation Commission; (21) New England Interstate Water Pollution Control Commission; (22) Delaware River Basin Commission; (23) U.S. Dept. of Health, Education, and Welfare; (24) U.S. Dept. of Commerce; (25) U.S. Dept. of Agriculture; (26) Water Resources Council; and (27) U.S. Dept. of the Interior.
 
 
 343
 The following organizations responded with comments: National Canners Association and American Frozen Food Institute; Potato Processors of Idaho; Lake Michigan Federation; Council for Agricultural Science and Technology; Florida Canners Association; California-Arizona Citrus League; Florida Citrus Commission; Institute of Gas Technology; Ore-Ida Foods; Sunkist Growers; Stearns, Conrad and Schmidt Consulting Engineers; U.S. Dept. of Health, Education, and Welfare; U.S. Dept. of Interior; U.S. Dept. of Agriculture; General Counsel of the Dept. of Commerce; State of Pennsylvania; State of North Carolina; State of Wisconsin; State of Colorado; State of Nebraska; State of Florida; Texas Water Quality Board; State of Michigan; State of Georgia; and American Society of Civil Engineers.
 
 
 344
 The comments were highly variable, ranging from full approval to rejection. It must be clearly understood that the treatment technologies used to develop the effluent limitations are alternative systems that have operated satisfactorily.
 
 
 345
 The primary issues raised in the development of the proposed effluent limitation guidelines and standards of performance and the treatment of these issues herein are as follows:
 
 
 346
 (1) Some comments were to the effect that the limitations were too stringent and not substantiated by data used in the study. Furthermore, the criticism was made that the sampling program was inadequate and unable to quantify the variability of waste loads. As explained in the Development Document, the degree of effluent reduction required by the applicable limitations currently is being attained by plants in all subcategories. Additionally, established alternative in-plant control and waste treatment procedures are readily available for application by the industry. As also explained in the Development Document, the sampling program was used to supplement and confirm data supplied by the processors (or other sources). The success of this effort is reflected in the utilization of data from sixty-two different plants to compute industry raw waste loads. Thus, the variability of waste loads has been considered in this computation as well as in the ratio of maximum daily limitations to maximum thirty day limitations.
 
 
 347
 (2) A number of commentors took the position that the limitations were not stringent enough and were developed from only a fraction of the industry still discharging to waterways. Limitations required by the implementation of best available control technology economically achievable have not been required as limitations for best practicable control technology currently available because the total cost of application of the technologies under the time limitations is too large in relation to the effluent reduction benefits to be achieved from such application. Land treatment and no discharge to navigable waterways has not been required because both suitable and adequate land at reasonable cost must be available and each processor may not have land meeting these requirements.
 
 
 348
 (3) The criticism was made that the performances of the biological systems used to develop the limitations were based on optimum performance. Each system's performance is based on as much information as available. In most cases the performance represents average results from the entire processing season. In a few cases more than a single processing season was used and in some cases less than a full processing season was used to evaluate the system's performance. Some plants currently are meeting the effluent limitations based on seasonal averages but may not achieve sufficient effluent reduction to meet each maximum thirty-day limitation. Nevertheless, at least one plant in each subcategory achieves sufficient effluent reduction to meet both maximum daily limitations and maximum thirty day limitations throughout the processing season.
 
 
 349
 (4) A number of comments from various sources were received regarding the accuracy of industry cost estimates. An assessment of these comments and a detailed economic analysis of the treatment technologies used to achieve the limitations have significantly refined the cost information about the industry. For example, the cost to the industry of land and land treatment facilities has been included. Nevertheless, the economic impact analysis of the effect of the proposed limitations on the industry indicates no substantial adverse impact will result for any major segment of the industry.
 
 
 350
 (5) During the formulation of these proposed guidelines, commentators raised questions about the adequacy of the proposed sub-categorization in view of: (a) Variations in unit costs for small plants as compared with large plants; and (b) the possible effect of temperature on biological treatment efficiency. Information with appropriate supportive technical and economic background data on this question is specifically requested. Additionally, in developing the proposed guidelines, difficulty was experienced in obtaining sufficient information and data on which to base a full and quantitative evaluation of the economic impact. The information and data available show that there will be an economic impact. However, more information is desired to enable a fuller assessment of the overall impact with respect to plant closings, employment, and on local communities. Information and data is specifically requested for the following: (i) Plant revenues, (ii) Production costs, (iii) Profits, (iv) Return on investment, (v) Pollution control costs, (vi) The level of capacity utilization for different size plants and the ability of plants to expand to a level where economies of scale can be realized; and (vii) Availability of access to municipal disposal systems or land irrigation disposal systems and the availability and costs of land for land-based disposal techniques. This is particularly important in the case of the potato processing segment for which only fragmentary data is available.
 
 
 351
 Interested persons may participate in this rulemaking by submitting written comments in triplicate to the EPA Information Center, Environmental Protection Agency, Washington, D.C. 20460. Attention: Mr. Philip B. Wisman. Comments on all aspects of the proposed regulations are solicited. In the event comments are in the nature of criticisms as to the adequacy of data which is available, or which may be relied upon by the Agency, comments should identify and, if possible, provide any additional data which may be available and should indicate why such data is essential to the development of the regulations. In the event comments address the approach taken by the Agency in establishing an effluent limitation guideline or standard of performance, EPA solicits suggestions as to what alternative approach should be taken and why and how this alternative better satisfies the detailed requirements of sections 301, 304(b), 306, and 307 of the Act.
 
 
 352
 A copy of all public comments will be available for inspection and copying at the EPA Information Center, Room 227, West Tower, Waterside Mall, 401 M Street S.W., Washington, D.C. A copy of preliminary draft contractor reports, the Development Document and economic study referred to above, and certain supplementary materials supporting the industry concerned will also be maintained at this location for public review and copying. The EPA information regulation, 40 CFR Part 2, provides that a reasonable fee may be charged for copying.
 
 
 353
 All comments received on or before December 10, 1973, will be considered. Steps previously taken by the Environmental Protection Agency to facilitate public response within this time period are outlined in the advance notice concerning public review procedures published on August 6, 1973 (38 FR 21202).
 
 
 354
 Dated: October 29, 1973.
 
 
 355
 JOHN QUARLES,
 
 
 356
 Acting Administrator.
 
 
 357
 PART 407 EFFLUENT LIMITATIONS GUIDELINES FOR EXISTING SOURCES AND STANDARDS OF PERFORMANCE AND PRETREATMENT STANDARDS FOR NEW SOURCES FOR THE CANNED AND PRESERVED FRUITS AND PROCESSING INDUSTRY POINT SOURCE CATEGORY
 
 
 358
 (Effluent Limitations for Apple Juice Subcategory (Subpart A), Apple Products Subcategory (Subpart B), and Citrus Products Subcategory (Subpart C) are omitted.)
 
 
 359
 Subpart D Frozen Potato Products Subcategory
 
 
 360
 Sec.
 
 
 361
 407.40 Applicability; description of frozen potato products subcategory.
 
 
 362
 407.41 Specialized definitions.
 
 
 363
 407.42 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best practicable control technology currently available.
 
 
 364
 407.43 Effluent limitations guidelines representing the degree of effluent reduction attainable by application of the best available technology economically achievable.
 
 
 365
 407.44 Standards of performance for new sources.
 
 
 366
 407.45 Pretreatment standards for new sources.
 
 
 367
 Subpart E Dehydrated Potato Products Subcategory
 
 
 368
 Sec.
 
 
 369
 407.50 Applicability; description of dehydrated potato products subcategory.
 
 
 370
 407.51 Specialized definitions.
 
 
 371
 407.52 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best practicable control technology currently available.
 
 
 372
 407.53 Effluent limitations guidelines representing the degree of effluent reduction attainable by application of the best available technology economically achievable.
 
 
 373
 407.54 Standards of performance for new sources.
 
 
 374
 407.55 Pretreatment standards for new sources.
 
 
 375
 Subpart D Frozen Potato Products Subcategory
 
 
 376
 § 407.40 Applicability; description of frozen potato products subcategory.
 
 
 377
 The provisions of this subpart are applicable to discharges resulting from the processing of white potatoes into frozen potato products. When a plant is subject to effluent limitations covering more than one subcategory, the plant discharge limitation shall be set by proration limitations for each subcategory based on the total raw material covered by each subcategory.
 
 
 378
 § 407.41 Specialized definitions.
 
 For the purpose of this subpart
 
 379
 (a) The following abbreviations shall have the following meanings: (i) "BOD5 " shall mean five day biochemical oxygen demand (ii) "TSS" shall mean total suspended nonfilterable solids; (iii) "kg" shall mean kilogram(s); (iv) "kkg" shall mean 1,000 kilograms; and (v) "lb" shall mean pound(s).
 
 
 380
 § 407.42 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best practicable control technology currently available.
 
 
 381
 The following limitations constitute the quantity or quality of pollutants or pollutant properties which may be discharged after application of the best practicable control technology currently available by a point source subject to the provisions of this subpart:
 
 
 382
 Effluent
characteristic Effluent limitation
BOD5 ............ Maximum for any one day 4.75 kg/kkg
 raw material (9.5 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 0.95
 kg/kkg raw material (1.9 lb/ton).
TSS ............. Maximum for any one day 8.75 kg/kkg
 raw material (17.5 lb/ton).
 Maximum average of daily for any period
 of thirty consecutive days 1.75 kg/
 kkg raw material (3.5 lb/ton).
pH .............. Within the range of 6.0 to 9.0.
 
 
 383
 § 407.43 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best available technology economically achievable.
 
 
 384
 The following limitations constitute the quantity or quality of pollutants or pollutant properties which may be discharged after application of the best available technology economically achievable by a point source subject to the provisions of this subpart:
 
 
 385
 Effluent
characteristic Effluent limitation
BOD5 ............ Maximum for any one day 0.8 kg/kkg
 raw material (1.6 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 0.16
 kg/kkg raw material (0.32 lb/ton).
TSS ............. Maximum for any one day 1.35 kg/kkg
 raw material (2.7 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 0.27
 kg/kkg raw material (0.54 lb/ton).
pH .............. Within the range of 6.0 to 9.0.
 
 
 386
 § 407.44 Standards of performance for new sources.
 
 
 387
 The following limitations constitute the quantity or quality of pollutants or pollutant properties which may be discharged reflecting the greatest degree of effluent reduction achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants by a new point source subject to the provisions of this subpart.
 
 
 388
 Effluent
characteristic Effluent limitation
BOD5 ............ Maximum for any one day 0.8 kg/kkg
 raw material (1.6 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 0.16
 kg/kkg raw material (0.32 lb/ton).
TSS ............. Maximum for any one day 1.35 kg/kkg
 raw material (2.7 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 0.27
 kg/kkg raw material (0.54 lb/ton).
pH .............. Within the range of 6.0 to 9.0.
 
 
 389
 § 407.45 Pretreatment standards for new sources.
 
 
 390
 The pretreatment standards under section 307(c) of the Act, for a source within the frozen potato products subcategory, which is an industrial user of a publicly owned treatment works (and which would be a new source subject to section 306 of the Act, if it were to discharge pollutants to navigable waters), shall be the standard set forth in 40 CFR 128, except that for the purpose of this section, 40 CFR 128.133 shall be amended to read as follows:
 
 
 391
 In addition to the prohibitions set forth in § 128.131, the pretreatment standard for incompatible pollutants introduced into a publicly owned treatment works by a major contributing industry shall be the standard of performance for new sources specified in 40 CFR 407.44: Provided, That, if the publicly owned treatment works which receives the pollutants is committed, in its NPDES permit, to remove a specified percentage of any incompatible pollutant, the pretreatment standard applicable to users of such treatment works shall be correspondingly reduced for that pollutant.
 
 
 392
 Subpart E Dehydrated Potato Products Subcategory
 
 
 393
 § 407.50 Applicability; description of dehydrated potato products subcategory.
 
 
 394
 The provisions of this subpart are applicable to the discharges resulting from the processing of white potatoes into dehydrated potato products. When a plant is subject to effluent limitations covering more than one subcategory, the plant discharge limitation shall be set by proration limitations for each subcategory based on the total raw material covered by each subcategory.
 
 
 395
 § 407.51 Specialized definitions.
 
 For the purpose of this subpart:
 
 396
 (a) The following abbreviations shall have the following meanings: (i) "BOD5 " shall mean five day biochemical oxygen demand; (ii) "TSS" shall mean total suspended nonfilterable solids; (iii) "kg" shall mean kilogram(s); (iv) "kkg" shall mean 1,000 kilograms; and (v) "lb" shall mean pound(s).
 
 
 397
 § 407.52 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best practicable control technology currently available.
 
 
 398
 The following limitations constitute the quantity or quality of pollutants or pollutant properties which may be discharged after application of the best practicable control technology currently available by a point source subject to the provisions of this subpart:
 
 
 399
 Effluent
characteristic Effluent limitation
BOD5 ............ Maximum for any one day 4.0 kg/kkg
 raw material (8.0 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 0.8
 kg/kkg raw material (1.6 lb/ton).
TSS ............. Maximum for any one day 8.0 kg/kkg
 raw material (16.0 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 1.6
 kg/kkg raw material (3.2 lb/ton).
pH .............. Within the range of 6.0 to 9.0.
 
 
 400
 § 407.53 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best available technology economically achievable.
 
 
 401
 The following limitations constitute the quantity of quality of pollutants or pollutant properties which may be discharged after application of the best available technology economically achievable by a point source subject to the provisions of this subpart:
 
 
 402
 Effluent
characteristic Effluent limitation
BOD5 ............ Maximum for any one day 0.8 kg/kkg
 raw material (1.6 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 0.16
 kg/kkg raw material (0.32 lb/ton).
TSS ............. Maximum for any one day 1.35 kg/kkg
 raw material (2.7 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 0.27
 kg/kkg raw material (0.54 lb/ton).
pH .............. Within the range of 6.0 to 9.0.
 
 
 403
 § 407.54 Standards of performance for new sources.
 
 
 404
 The following limitations constitute the quantity or quality of pollutants or pollutant properties which may be discharged reflecting the greatest degree of effluent reduction achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants by a new point source subject to the provisions of this subpart:
 
 
 405
 Effluent
characteristic Effluent limitation
BOD5 ............ Maximum for any one day 0.8 kg/kkg
 raw material (1.6 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 0.16
 kg/kkg raw material (0.32 lb/ton).
TSS ............. Maximum for any one day 1.35 kg/kkg
 raw material (2.7 lb/ton).
 Maximum average of daily values for any
 period of thirty consecutive days 0.27
 kg/kkg raw material (0.54 lb/ton).
pH .............. Within the range of 6.0 to 9.0.
 
 
 406
 § 407.55 Pretreatment standards for new sources.
 
 
 407
 The pretreatment standards under section 307(c) of the Act, for a source within the dehydrated potato products subcategory which is an industrial user of a publicly owned treatment works (and which would be a new source subject to section 306 of the Act, if it were to discharge pollutants to navigable waters), shall be the standard set forth in 40 CFR Part 128, except that for the purpose of this section, 40 CFR 128.133 shall be amended to read as follows:
 
 
 408
 In addition to the prohibitions set forth in § 128.131, the pretreatment standard for incompatible pollutants introduced into a publicly owned treatment works by a major contributing industry shall be the standard of performance for new sources specified in § 407.54, 40 CFR, Part 40; Provided, That, if the publicly owned treatment works which receives the pollutants is committed, in its NPDES permit, to remove a specified percentage of any incompatible pollutant, the pretreatment standard applicable to users of such treatment works shall be correspondingly reduced for that pollutant.
 
 
 409
 (FR Doc. 73-23333 Filed 11-8-73:8:45 am)APPENDIX B
 
 RULES AND REGULATIONS
 Title 40 Protection of the Environment
 CHAPTER I ENVIRONMENTAL PROTECTION AGENCY
 SUBCHAPTER N EFFLUENT GUIDELINES AND STANDARDS
 
 410
 PART 407 CANNED AND PRESERVED FRUITS AND VEGETABLES PROCESSING POINT SOURCE CATEGORY
 
 Apple, Citrus and Potato Subcategories
 
 411
 On November 9, 1973, notice was published in the Federal Register (38 FR 31076), that the Environmental Protection Agency (EPA or Agency) was proposing effluent limitations guidelines for existing sources and standards of performance and pretreatment standards for new sources within the apple juice subcategory, apple products subcategory, citrus products subcategory, frozen potato products subcategory, and the dehydrated potato products subcategory of the Canned and Preserved Fruits and Vegetables Processing category of point sources.
 
 
 412
 The purpose of this notice is to establish final effluent limitations guidelines for existing sources and standards of performance and pretreatment standards for new sources in the Canned and Preserved Fruits and Vegetables Processing category of point sources, by amending 40 CFR Chapter I, Subchapter N, to add a new Part 407. This final rulemaking is promulgated pursuant to sections 301, 304(b) and (c), 306(b) and (c) and 307(c) of the Federal Water Pollution Control Act, as amended, (the Act); 33 U.S.C. 1251, 1311, 1314(b) and (c), 1316(b) and (c) and 1317(c); 86 Stat. 816 et seq.; Pub.L. 92-500. Regulations regarding cooling water intake structures for all categories of point sources under section 316(b) of the Act will be promulgated in 40 CFR Part 402.
 
 
 413
 In addition, EPA is simultaneously proposing a separate provision which appears in the proposed rules section of the Federal Register, stating the application of the limitations and standards set forth below to users of publicly owned treatment works which are subject to pretreatment standards under section 307(b) of the Act. The basis of that proposed regulation is set forth in the associated notice of proposed rulemaking.
 
 
 414
 The legal basis, methodology and factual conclusions which support promulgation of this regulation were set forth in substantial detail in the notice of public review procedures published August 6, 1973 (38 FR 21202) and in the notice of proposed rulemaking for the apple juice subcategory, apple products subcategory, citrus products subcategory, frozen potato products subcategory, and dehydrated potato products subcategory. In addition, the regulations as proposed were supported by two other documents: (1) The document entitled "Development Document for Proposed Effluent Limitations Guidelines and New Source Performance Standards for the citrus, apple and potato Segment of the Canned and Preserved Fruits and Vegetables Processing Point Source Category" (November, 1973) and (2) the document entitled "Economic Analysis of Proposed Effluent Guidelines, Fruit and Vegetable Processing Industry" (October, 1973). Both of these documents were made available to the public and circulated to interested persons at approximately the time of publication of the notice of proposed rulemaking.
 
 
 415
 Interested persons were invited to participate in the rulemaking by submitting written comments within 30 days from the date of publication. Prior public participation in the form of solicited comments and responses from the States, Federal agencies, and other interested parties were described in the preamble to the proposed regulation. The EPA has considered carefully all of the comments received and a discussion of these comments with the Agency's response thereto follows.
 
 
 416
 The regulation as promulgated contains important changes from the proposed regulation. The following discussion outlines the reasons why these changes were made and why other suggested changes were not implemented.
 
 
 417
 (a) Summary of comments.
 
 
 418
 The following responded to the request for written comments contained in the preamble to the proposed regulation: U.S. Department of Health, Education and Welfare; Sunkist Growers, Inc.; Council for Agricultural Science and Technology; Tree Top, Inc.; National Canners Association; American Frozen Food Institute; Taterstate Frozen Foods; Florida Canners Association; Potato Processors of Idaho; State of California; State of New York; State of Michigan; the R. T. French Company; J. R. Simplot Company; Ore-Ida Foods, Inc.; Water Resources Council and State of Colorado.
 
 
 419
 Each of the comments received was reviewed and analyzed carefully. The following is a summary of the significant comments and the Agency's response to those comments.
 
 
 420
 (1) A number of comments reflected concern that the effluent limitations would not be met by the exemplary treatment systems used in their development.
 
 
 421
 Effluent treatment data from the exemplary treatment systems has been reviewed with the determination that several exemplary systems would not meet each maximum thirty day and maximum daily limitation throughout the processing season. Additional data has been received which has expanded the data base, strengthened the reliability of the exemplary data, and demonstrated the monthly and daily fluctuations experienced by the exemplary treatment systems. The data base for one plant was expanded from four months to twelve months and another from six months to sixteen months. One system was omitted from the exemplary list after additional information supplied by industry voided most of the effluent data. In summary, the discharge values representative of the exemplary treatment systems have been reviewed and some have been revised. The effluent limitations have been accordingly revised so that exemplary plants used to develop the limitations in each subcategory meet respective maximum day and maximum thirty day limitations.
 
 
 422
 (2) The comment was made that the proposed subcategorization was inadequate in view of variations in unit costs for small plants as compared with large plants and the possible effect of temperature on biological treatment efficiency.
 
 
 423
 Each of these factors has been considered and additional subcategorization is not required with regard to size; severe diseconomies of scale have not been realized by small processors with either best practicable or best available technology. Effluent limitations have been developed from exemplary treatment systems at plants ranging in size from very small to very large. Activated sludge treatment is effectively utilized by both small and large processors; land disposal techniques such as irrigation and municipal disposal systems are also used throughout the industry without regard to plant size. As for the effect of temperature on treatment efficiency, biological systems are effectively utilized in all climates. Activated sludge, aerated lagoons and trickling filters are exemplary treatment systems operating effectively in cold temperatures. The fluctuation experienced throughout the year by Canadian exemplary plants are the principal basis for determining maximum limitations.
 
 
 424
 (3) A number of comments were received that questioned the validity of using data from Canadian processors. It was suggested that these Canadian plants were operating under different economic conditions than those experienced in the United States.
 
 
 425
 The Agency has contacted Canadian officials and important similarities have been found between the U.S. and Canadian methods of handling industrial expenditures for pollution control equipment. Canada allows a rapid tax write-off for capital equipment for pollution control. The U.S. allows either a rapid tax write-off or an investment tax credit. There are no Canadian subsidies for pollution control; there is no industrial pollution control demonstration program such as that funded in the U.S. One of the two Canadian plants utilized in the development of the effluent limitations has received government finances for capital equipment within the processing plant because it located within an economically depressed region. No pollution control expenditures were allowed. No government finances or subsidies have been given to the other Canadian processing plants. Since the American and Canadian industries operate within similar tax guidelines, receive no direct pollution control subsidies, and compete in similar markets, then the Canadian data is valid and useful in determining best practicable or best available control technologies.
 
 
 426
 (4) The comment was made that the cost and energy requirements of best practicable technology were underestimated.
 
 
 427
 The Agency's cost and energy estimates were prepared from calculations of average waste water loadings based on generally accepted engineering practices. Cost estimates were verified with industry-supplied information. Calculations were prepared separately for each treatment technology by subcategory. It is understandable that some industry estimates might be excessive if higher than average waste loads were treated or if comparisons were made based on flow alone. High land costs or poor treatment design causing poor mixing or poor oxygen transfer might also create excessive cost or energy requirements. However, no dramatic capital or operating costs or energy increases should be attributable to any increased need for additional treatment technology which might result from compliance with this regulation. Industry cost estimates include costs for biological treatment plus costs for land treatment systems such as spray irrigation. Since no incompatible pollutants are discharged from this industry segment, no pretreatment or municipal treatment costs are applicable.
 
 
 428
 (5) Concern was expressed with regard to the omission of disinfection of industry waste waters.
 
 
 429
 The Agency has reviewed industry waste water information and has found that high levels of fecal coliform bacteria may exist. Disinfection is consequently a necessary adjunct to the effluent limits. Coliform bacterial limits have not been imposed as 1977 limitations because of economic considerations; 1983 limitations include a discharge limit for the fecal coliform bacteria. This limit is readily achievable by chlorination, ozonation or other possible methods for disinfecting water.
 
 
 430
 (6) The suggestion was made that land disposal techniques such as spray or flood irrigation are not the panacea for achieving the effluent limitations.
 
 
 431
 The Agency recognizes that land disposal techniques are not the only treatment technology available to food processors for achieving the effluent limitations. No single alternative is the panacea for achieving the limitations. Land treatment, however, is an effective technology which offers a viable alternative to biological treatment or municipal discharge. Such factors as availability of suitable land or proximity to a municipal system will influence the selection of a treatment technology. The economic and technical attractiveness of land disposal techniques are reflected in the large number of food processors that utilize land disposal techniques.
 
 
 432
 (7) The comment was made that a start-up period of four days was not sufficient time to allow treatment plants to achieve the limitations.
 
 
 433
 Information describing exemplary activated sludge and trickling filter systems indicate that required sludge growths can be achieved in two to four days and the required removal rate can be achieved in four to seven days after a two or three month shut-down period in which the systems were maintained in an operable state. Accordingly, the start-up period has been increased to one week and allowances in the maximum and thirty day limitations are permitted for this start-up period.
 
 
 434
 (8) One commenter suggested the possibility that a public health hazard may result from compliance with the regulation.
 
 
 435
 Neither best practicable nor best available technology requires significant in-plant changes that could result in a public health hazard. Efficient water management programs are encouraged and the Agency agrees that the programs must be based on minimum Good Manufacturing Practices.
 
 
 436
 (9) Some correspondents endorsed the proposal made to the Administrator by the Effluent Standards and Water Quality Information Advisory Committee that a significantly different approach be taken in the development of effluent guidelines generally.
 
 
 437
 The committee's proposal is under evaluation as a contribution toward future refinements on guidelines for some industries. The committee has indicated that their proposed methodology could not be developed in sufficient time to be available for the current phase of guideline promulgation, which is proceeding according to a court-ordered schedule. Its present state of development does not provide sufficient evidence to warrant the Agency's delaying issuance of any standard in hopes that an alternative approach might be preferable.
 
 
 438
 (b) Revision of the proposed regulation prior to promulgation.
 
 
 439
 As a result of public comments and continuing review and evaluation of the proposed regulations by the EPA, the following changes have been made in the regulation.
 
 
 440
 (1) The data from the exemplary treatment plants have been reviewed with the result that the discharge values are more representative of the effectiveness of the exemplary systems. Accordingly, the 1977 and 1983 limitations for BOD5 and TSS which are based on these treatment plants have been modified to reflect more accurately the average of the performances of these exemplary plants.
 
 
 441
 (2) The maximum thirty day and maximum day limitations have been modified to reflect more accurately the demonstrated fluctuations experienced by the exemplary treatment systems.
 
 
 442
 (3) The best available control technology economically achievable has been changed to specifically include disinfection; effluent limits for fecal coliform bacteria have been added to the 1983 limitations.
 
 
 443
 (4) Section 304(b)(1)(B) of the Act provides for "guidelines" to implement the uniform national standards of section 301(b)(1)(A). Thus Congress recognized that some flexibility was necessary in order to take into account the complexity of the industrial world with respect to the practicability of pollution control technology. In conformity with the Congressional intent and in recognition of the possible failure of these regulations to account for all factors bearing on the practicability of control technology, it was concluded that some provision was needed to authorize flexibility in the strict application of the limitations contained in the regulation where required by special circumstances applicable to individual dischargers. Accordingly, a provision allowing flexibility in the application of the limitations representing best practicable control technology currently available has been added to each subpart, to account for special circumstances that may not have been adequately accounted for when these regulations were developed.
 
 
 444
 (c) Economic impact.
 
 
 445
 The above mentioned changes will not significantly affect the conclusion of the economic study of the proposed regulation. Because most effluent limitations are less stringent than originally proposed, the economic impact has actually been lessened.
 
 
 446
 (d) Cost-benefit analysis.
 
 
 447
 The detrimental effects of the constituents of waste waters now discharged by point sources within the Apple, Citrus and Potato segment of the Canned and Preserved Fruits and Vegetables Processing Point Source Category are discussed in section VI of the report entitled "Development Document for Effluent Limitations Guidelines for the Apple, Citrus, and Potato Segment of the Canned and Preserved Fruits and Vegetables Processing Point Source Category" (February 1974). It is not feasible to quantify in economic terms, particularly on a national basis, the costs resulting from the discharge of these pollutants to our Nation's waterways. Nevertheless, as indicated in section VI, the pollutants discharged have substantial and damaging impacts on the quality of water and therefore on its capacity to support healthy populations of wildlife, fish and other aquatic wildlife and on its suitability for industrial, recreational and drinking water supply uses.
 
 
 448
 The total cost of implementing the effluent limitations guidelines includes the direct capital and operating costs of the pollution control technology employed to achieve compliance and the indirect economic and environmental costs identified in section VIII and in the supplementary report entitled "Economic Analysis of Proposed Effluent Guidelines, FRUITS AND VEGETABLES PROCESSING INDUSTRY" (October, 1973). Implementing the effluent limitations guidelines will substantially reduce the environmental harm which would otherwise be attributable to the continued discharge of polluted waste waters from existing and newly constructed plants in the canned and preserved fruits and vegetables processing industry. The Agency believes that the benefits of thus reducing the pollutants discharged justify the associated costs which, though substantial in absolute terms, represent a relatively small percentage of the total capital investment in the industry.
 
 
 449
 (e) Publication of information on processes, procedures, or operating methods which result in the elimination or reduction of the discharge of pollutants.
 
 
 450
 In conformance with the requirements of section 304(c) of the Act, a manual entitled, "Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Apple, Citrus and Potato Segment of the Canned and Preserved Fruits and Vegetables Processing Point Source Category," has been published and is available for purchase from the Government Printing Office, Washington, D.C., 20401 for a nominal fee.
 
 
 451
 (f) Final rulemaking.
 
 
 452
 In consideration of the foregoing, 40 CFR Chapter I, Subchapter N is hereby amended by adding a new Part 407, Canned and Preserved Fruits and Vegetables Processing Point Source Category, to read as set forth below. This final regulation is promulgated as set forth below and shall be effective May 20, 1974.
 
 
 453
 Dated: March 12, 1974.
 
 
 454
 John Quarles,
 
 
 455
 Acting Administrator.
 
 
 456
 (Effluent Limitations for Apple Juice Subcategory (Subpart A), Apple Products, Subcategory (Subpart B), and Citrus Products Subcategory (Subpart C) are omitted.)
 
 
 457
 Subpart D Frozen Potato Products Subcategory
 
 
 458
 407.40 Applicability; description of the frozen potato products subcategory.
 
 
 459
 407.41 Specialized definitions.
 
 
 460
 407.42 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best practicable control technology currently available.
 
 
 461
 407.43 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best available technology economically achievable.
 
 407.44 (Reserved)
 
 462
 407.45 Standards of performance for new sources.
 
 
 463
 407.46 Pretreatment standards for new sources.
 
 
 464
 Subpart E Dehydrated Potato Products Subcategory
 
 
 465
 407.50 Applicability; description of the dehydrated potato products subcategory.
 
 
 466
 407.51 Specialized definitions.
 
 
 467
 407.52 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best practicable control technology currently available.
 
 
 468
 407.53 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best available technology economically achievable.
 
 407.54 (Reserved)
 
 469
 407.55 Standards of performance for new sources.
 
 
 470
 407.56 Pretreatment standards for new sources.
 
 
 471
 Subpart D Frozen Potato Products Subcategory
 
 
 472
 § 407.40 Applicability; description of the frozen potato products subcategory.
 
 
 473
 The provisions of this subpart are applicable to discharges resulting from the processing of white potatoes into frozen potato products. When a plant is subject to effluent limitations covering more than one subcategory, the plant discharge limitation shall be set by proration limitations for each subcategory based on the total raw material covered by each subcategory.
 
 
 474
 § 407.41 Specialized definitions.
 
 For the purpose of this subpart:
 
 475
 (a) Except as provided below, the general definitions, abbreviations and methods of analysis set forth in 40 CFR Part 401 shall apply to this subpart.
 
 
 476
 § 407.42 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best practicable control technology currently available.
 
 
 477
 (a) In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with respect to factors (such as age and size of plant, raw materials, manufacturing processes, products produced, treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry. An individual discharger or other interested person may submit evidence to the Regional Administrator (or to the State, if the State has the authority to issue NPDES permits) that factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines. On the basis of such evidence or other available information, the Regional Administrator (or the State) will make a written finding that such factors are or are not fundamentally different from that facility compared to those specified in the Development Document. If such fundamentally different factors are found to exist, the Regional Administrator or the State shall establish for the discharger effluent limitations in the NPDES permit either more or less stringent than the limitations established herein, to the extent dictated by such fundamentally different factors. Such limitations must be approved by the Administrator of the Environmental Protection Agency. The Administrator may approve or disapprove such limitations, specify other limitations, or initiate proceedings to revise these regulations.
 
 
 478
 (b) The following limitations establish the quantity or quality of pollutants or pollutant properties, controlled by this section, which may be discharged by a point source subject to the provisions of this subpart after application of the best practicable control technology currently available:
 
 
 479
 ----------------------------------------------------------------
 Effluent limitations
 ----------------------------------------------
 Average of daily
 values for 30
 consecutive
 Effluent Maximum for days shall not
characteristic any 1 day exceed--
----------------------------------------------------------------
 Metric units (kilograms per 1,000 kg
 of raw material)
 ----------------------------------------------
BOD5 ...................... 2.80 1.40
TSS ....................... 2.80 1.40
pH .............. Within the range 6.0 to 9.0.
 ----------------------------------------------
 English units (pounds per 1,000 lb
 of raw material)
 ----------------------------------------------
BOD5 ...................... 2.80 1.40
TSS ....................... 2.80 1.40
pH .............. Within the range 6.0 to 9.0.
----------------------------------------------------------------
 
 
 480
 § 407.43 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best available technology economically achievable.
 
 
 481
 The following limitations establish the quantity or quality of pollutants or pollutant properties, controlled by this section, which may be discharged by a point source subject to the provisions of this subpart after application of the best available technology economically achievable:
 
 
 482
 ----------------------------------------------------------------
 Effluent limitations
 ----------------------------------------------
 Average of daily
 values for 30
 consecutive
 Effluent Maximum for days shall not
characteristic any 1 day exceed--
----------------------------------------------------------------
 Metric units (kilograms per 1,000 kg
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coliform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
 ----------------------------------------------
 English units (pounds per 1,000 lb
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coliform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
----------------------------------------------------------------
 
 
 483
 § 407.44 (Reserved)
 
 
 484
 § 407.45 Standards of performance for new sources.
 
 
 485
 The following standards of performance establish the quantity or quality of pollutants or pollutant properties, controlled by this section, which may be discharged by a new source subject to the provisions of this subpart:
 
 
 486
 ----------------------------------------------------------------
 Effluent limitations
 ----------------------------------------------
 Average of daily
 values for 30
 consecutive
 Effluent Maximum for days shall not
characteristic any 1 day exceed--
----------------------------------------------------------------
 Metric units (kilograms per 1,000 kg
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coliform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
 ----------------------------------------------
 English units (pounds per 1,000 lb
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal colfiorm .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
----------------------------------------------------------------
 
 
 487
 § 407.46 Pretreatment standards for new sources.
 
 
 488
 The pretreatment standards under section 307(c) of the Act for a source within the frozen potato products subcategory, which is a user of a publicly owned treatment works (and which would be a new source subject to section 306 of the Act, if it were to discharge pollutants to the navigable waters), shall be the standard set forth in 40 CFR Part 128, except that, for the purpose of this section, 40 CFR Part 128.133 shall be amended to read as follows:
 
 
 489
 In addition to the prohibitions set forth in 40 CFR 128.131, the pretreatment standard for incompatible pollutants introduced into a publicly owned treatment works shall be the standard of performance for new sources specified in 40 CFR 407.45: Provided, That, if the publicly owned treatment works which received the pollutants is committed, in its NPDES permit, to remove a specified percentage of any incompatible pollutant, the pretreatment standard applicable to users of such treatment works shall, except in the case of standards providing for no discharge of pollutants, be correspondingly reduced in stringency for that pollutant.
 
 
 490
 Subpart E Dehydrated Potato Products Subcategory
 
 
 491
 § 407.50 Applicability; description of the dehydrated potato products subcategory.
 
 
 492
 The provisions of this subpart are applicable to discharges resulting from the processing of white potatoes into dehydrated potato products. When a plant is subject to effluent limitations covering more than one subcategory, the plant discharge limitation shall be set by proration limitations for each subcategory based on the total raw material covered by each subcategory.
 
 
 493
 § 407.51 Specialized definitions.
 
 For the purpose of this subpart:
 
 494
 (a) Except as provided below, the general definitions, abbreviations and methods of analysis set forth in 40 CFR Part 401 shall apply to this subpart.
 
 
 495
 § 407.52 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best practicable control technology currently available.
 
 
 496
 (a) In establishing the limitations set forth in this section, EPA took into account all information it was able to collect, develop and solicit with respect to factors (such as age and size of plant, raw materials, manufacturing processes, products produced, treatment technology available, energy requirements and costs) which can affect the industry subcategorization and effluent levels established. It is, however, possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry. An individual discharger or other interested person may submit evidence to the Regional Administrator (or to the State, if the State has the authority to issue NPDES permits) that factors relating to the equipment or facilities involved, the process applied, or other such factors related to such discharger are fundamentally different from the factors considered in the establishment of the guidelines. On the basis of such evidence or other available information, the Regional Administrator (or the State) will make a written finding that such factors are or are not fundamentally different for that facility compared to those specified in the Development Document. If such fundamentally different factors are found to exist, the Regional Administrator or the State shall establish for the discharge effluent limitations in the NPDES permit either more or less stringent than the limitations established herein, to the extent dictated by such fundamentally different factors. Such limitations must be approved by the Administrator of the Environmental Protection Agency. The Administrator may approve or disapprove such limitations, specify other limitations, or initiate proceedings to revise these regulations.
 
 
 497
 (b) The following limitations establish the quantity or quality of pollutants or pollutant properties, controlled by this section, which may be discharged by a point source subject to the provisions of this subpart after application of the best practicable control technology currently available:
 
 
 498
 ----------------------------------------------------------------
 Effluent limitations
 ----------------------------------------------
 Average of daily
 values for 30
 consecutive
 Effluent Maximum for days shall not
characteristic any 1 day exceed--
----------------------------------------------------------------
 Metric units (kilograms per 1,000 kg
 of raw material)
 ----------------------------------------------
BOD5 ...................... 2.40 1.20
TSS ....................... 2.80 1.40
pH .............. Within the range 6.0 to 9.0.
 ----------------------------------------------
 English units (pounds per 1,000 lb
 of raw material)
 ----------------------------------------------
BOD5 ...................... 2.40 1.20
TSS ....................... 2.80 1.40
pH .............. Within the range 6.0 to 9.0.
----------------------------------------------------------------
 
 
 499
 § 407.53 Effluent limitations guidelines representing the degree of effluent reduction attainable by the application of the best available technology economically achievable.
 
 
 500
 The following limitations establish the quantity or quality of pollutants or pollutant properties, controlled by this section, which may be discharged by a point source subject to the provisions of this subpart after application of the best available technology economically achievable:
 
 
 501
 ----------------------------------------------------------------
 Effluent limitations
 ----------------------------------------------
 Average of daily
 values for 30
 consecutive
 Effluent Maximum for days shall not
characteristic any 1 day exceed--
----------------------------------------------------------------
 Metric units (kilograms per 1,000 kg
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coliform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
 ----------------------------------------------
 English units (pounds per 1,000 lb
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coilform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
----------------------------------------------------------------
 
 
 502
 § 407.54 (Reversed)
 
 
 503
 § 407.55 Standards of performance for new sources.
 
 
 504
 The following standards of performance establish the quantity or quality of pollutants or pollutant properties, controlled by this section, which may be discharged by a new source subject to the provisions of this subpart:
 
 
 505
 ----------------------------------------------------------------
 Effluent limitations
 ----------------------------------------------
 Average of daily
 values for 30
 consecutive
 Effluent Maximum for days shall not
characteristic any 1 day exceed--
----------------------------------------------------------------
 Metric units (kilograms per 1,000 kg
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coliform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
 ----------------------------------------------
 English units (pounds per 1,000 lb
 of raw material)
 ----------------------------------------------
BOD5 ...................... 0.34 0.17
TSS ....................... 1.10 .55
Fecal coliform .. Maximum at any time 400 counts/100 ml.
pH .............. Within the range 6.0 to 9.0.
----------------------------------------------------------------
 
 
 506
 § 407.56 Pretreatment standards for new sources.
 
 
 507
 The pretreatment standards under section 307(c) of the Act for a source within the dehydrated potato products subcategory, which is a user of a publicly owned treatment works (and which would be a new source subject to section 306 of the Act, if it were to discharge pollutants to the navigable waters), shall be the standard set forth in 40 CFR Part 128, except that, for the purpose of this section, 40 CFR 128.133 shall be amended to read as follows:
 
 
 508
 In addition to the prohibitions set forth in 40 CFR 128.131, the pretreatment standard for incompatible pollutants introduced into a publicly owned treatment works shall be the standard of performance for new sources specified in 40 CFR 407.55; provided that, if the publicly owned treatment works which receives the pollutants is committed, in its NPDES permit, to remove a specified percentage of any incompatible pollutant, the pretreatment standard applicable to users of such treatment works shall, except in the case of standards providing for no discharge of pollutants, be correspondingly reduced in stringency for that pollutant.
 
 
 509
 (FR Doc. 74-6238 Filed 3-20-74; 8:45 am)
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 291(a)
 
 
 [1]
 The Act also deals at length with standards for publicly owned waste treatment plants and makes massive federal appropriations available to upgrade such facilities. 33 U.S.C. §§ 1281-92, 1311(b)(1)(B), 1311(b)(2)(B), 1314(d) (1) (Supp. III, 1973)
 
 
 [2]
 Congressional Research Service, a Legislative History of the Water Pollution Control Act Amendments of 1972 (Comm. Print 1973). (Hereinafter cited as Leg.Hist.)
 
 
 [3]
 We deal with the issue of jurisdiction sua sponte because of its importance in the administration of a new statute. Since petitioners do not raise this issue, briefs amici curiae have been accepted from: Union Carbide Corp., American Petroleum Institute, American Paper Institute, Monsanto Co., Dow Chemical Co., E. I. duPont de Nemours & Co., and Celanese Corp
 
 
 [4]
 The legislative history previously recited supports these views. The Conference Report states that the Senate bill allows for "(s)uits for review of the Administrator's action in approving or promulgating any effluent limitation under section 301 or 302. . . ." Significantly, the Report further states that § 509 is "the same as the Senate bill" in this respect. Leg.Hist. at 330. The language in the House Report is to the same effect. Leg.Hist. at 823
 
 
 [5]
 With all respect, we feel that our colleagues in the Eighth Circuit, in their analysis of the Act on the jurisdiction issue, failed to see the forest for the trees. While we believe that the statutory language and legislative expressions we have relied upon are conclusive on this issue, we also note with agreement that Judge Tone wielded a sharp ax on some of the trees:
 Under § 401(a)(1), applicants for any federal license must obtain state certification that they comply with § 301 or that "there is not an applicable effluent limitation . . . under sections 301(b) and 302 . . . ." We find this language especially significant because it cannot be construed as referring to §§ 301(a), (c) or (f), the explanation the Eighth Circuit gave for other references to "effluent limitations under § 301." CPC International Inc. v. Train, supra, 515 F.2d at 1042-1043. In addition, § 505(f), which defines "effluent standard or limitation under this Act" for purposes of § 505 (the citizen suit provision), includes in the definition, "(2) an effluent limitation or other limitation under section 301 or 302 of this Act," and "(6) a permit or condition thereof . . . ." We agree with the courts in American Iron and Steel Institute v. EPA, supra (526 F.2d 1027 at 1038) and E. I. duPont de Nemours & Co. v. Train, 383 F.Supp. 1244, 1251 (W.D.Va.1974), (aff'd 528 F.2d 1136) (4th Cir.), that under the interpretation of the Act urged by amici here subsection (2) and (6) of § 505(f) would be redundant, and disagree with the Eighth Circuit (CPC International Inc. v. Train, supra, 515 F.2d at 1043) that the reference to § 301 in § 505(f)(2) is to § 301(f). In summary, the most natural reading of the language of the Act is that § 301 is a source of authority to promulgate effluent limitations, independent of the § 402 permit procedure.
 American Meat Institute v. EPA, supra at 451.
 
 
 [6]
 We note petitioners' argument that the Administrator originally issued notices which implied that the guidelines would be published first and the limitations afterwards. We accept this as evidence that the Administrator would have followed the course advocated as the only permissible one by petitioners, absent the exigencies of time
 
 
 [7]
 From this environmentalist critics of EPA deduce that the EPA's 1977 limitations based on the "best practicable technology" are far too lax. This contention, however, is not before us as an appellate issue